# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

LEO HARDY,

                    Plaintiff,

v.                                                    Case No. 13-CV-769-JPS

CITY OF MILWAUKEE,
EDWARD FLYNN, MICHAEL GASSER,
OFFICER KEITH GARLAND, JR.,
PATRICK COE, MICHAEL VALUCH, JR.,
ROLANDO HERNANDEZ, and
UNKNOWN MILWAUKEE POLICE                              ORDER
DEPARTMENT EMPLOYEES AND
OFFICERS,

                    Defendants.

The plaintiff, Leo Hardy, alleges that he was illegally strip searched and falsely arrested, and seeks 42 U.S.C. § 1983 redress against the Milwaukee Police Department officers who searched and arrested him, as well as the City of Milwaukee and the officers' supervisors. (Docket #34). The defendants have moved for summary judgment on a portion of Mr. Hardy's claims. (Docket #50). That motion has been fully briefed (Docket #51, #68, #83), and the Court now turns to decide it.

1.    SUMMARY JUDGMENT STANDARD

The Court begins this order by setting forth the legal standard applicable to summary judgment motions. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute

over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

However, in deciding whether there are any genuine issues of material fact, the Court must view the record in the light most favorable to Mr. Hardy and draw all reasonable inferences in his favor. *Id.*, at 255. The Court cannot weigh the evidence or decide which party's submissions and testimony are more believable. *Id.*

This standard is very important in this case, because the parties have submitted conflicting evidence on several of Mr. Hardy's claims. Thus, in discussing the background of the case, the Court must be sure to view the record and draw all reasonable inferences in Mr. Hardy's favor. *Id.* Thus, in a situation like this—where the parties have submitted conflicting evidence and do not agree on the import of that evidence—it is very difficult for the Court to find that summary judgment is appropriate.

2.     BACKGROUND

The Court now turns to discussing the factual and legal background before it.

2.1     Factual Background

Mr. Hardy is an African-American resident of the City of Milwaukee. (PPFF ¶ 1).[1] For a period of time, Mr. Hardy lived in Mayflower Court; his mother continued to live there through March of 2012. (PPFF ¶ 2).

---

[1] The Court will refer to the defendants' proposed findings of fact as "DPFF" and Mr. Hardy's proposed findings of fact as "PPFF." Of course, as already mentioned, the Court is bound to view the record and draw all reasonable inferences in Mr. Hardy's favor without weighing the evidence. *Anderson*, 477 U.S. at 255. Therefore, the Court will take its discussion of the facts largely from Mr. Hardy's proposed findings, particularly where the defendants do not dispute those facts. Where there is a dispute between the parties, the Court will note the dispute, but draw every reasonable inference in Mr. Hardy's favor.

On March 13, 2012, at 4:16 p.m., the Milwaukee Police Department received a trespassing report from a citizen. (PPFF ¶ 3). The citizen stated that an individual named Marquis Kirksey ("Kirksey") had been seen trespassing around Mayflower Court. (PPFF ¶ 3).

Milwaukee Police Department Officers Gasser and Garland were dispatched to investigate this report, and arrived in the area, near the corner of Seventh Street and Walnut Street, shortly after 5:13 p.m. (PPFF ¶¶ 4–5). After arriving, Officers Gasser and Garland drove around the area searching for a white Acura, which reportedly belonged to Kirksey, the suspect. (PPFF ¶¶ 4, 6). The officers searched the area for approximately eight minutes, but found nothing. (PPFF ¶ 7). They then parked their car and began to run a warrant check for Kirksey. (PPFF ¶¶ 7–8).

While the officers were parked, Christopher Wichgers ("Wichgers"), a security guard for the housing complex, pulled up next to their vehicle. (PPFF ¶ 8). He spoke with the officers for less than a minute, during which time he told officers that Mr. Hardy was an acquaintance of Kirksey. (PPFF ¶¶ 9–10).

Around the same time, Mr. Hardy drove to visit his mother at Mayflower Court. (PPFF ¶ 2). While the officers were speaking with Wichgers, Mr. Hardy drove past them. (PPFF ¶ 11). Wichgers identified Mr. Hardy's car, and reported that both Mr. Hardy and Kirksey hang around in an area where people deal drugs. (PPFF ¶ 12). The officers then began to

follow Mr. Hardy's car, seeking to speak with Mr. Hardy about Kirksey and to check whether Kirksey happened to be in Mr. Hardy's car. (PPFF ¶ 13).[2]

The officers followed Mr. Hardy's car for a very short time; during that time, they did not observe Mr. Hardy commit any traffic violations, nor did they activate their lights or sirens or pull Mr. Hardy over. (PPFF ¶¶ 15–16). Rather, Mr. Hardy parked the car of his own volition in front of his mother's home. (PPFF ¶¶ 16, 19). He then exited his car to begin walking towards his mother's residence. (PPFF ¶¶ 19, 21).[3]

The officers parked their squad car behind Mr. Hardy's car, and requested that Mr. Hardy return to the area of the cars. (PPFF ¶¶ 19, 21–22, 24). Hardy complied, returning to his vehicle, at which time he either provided the officers with his driver's license or received a pat-down search from the officers. (*See* PPFF ¶ 23, and Def.'s Resp. thereto).

The Court must stop here to point out several important facts. At this point, the officers did not have any information that Mr. Hardy was involved in criminal activity: they did not observe any traffic violations, had not

---

[2]Officer Garland testified to these facts. (*See* Def.'s Resp. to PPFF ¶¶ 12–13). Officer Gasser, on the other hand, testified that Wichgers reported that Mr. Hardy, himself, dealt drugs, and that the officers followed Mr. Hardy's car to check up on these drug-dealing suspicions. (*See* Def.'s Resp. to PPFF ¶¶ 12–13). The defendants would like the Court to adopt Officer Gasser's version of events, but the Court will not weigh the credibility of the statements at this stage. Instead, reading the evidence in the light most favorable to Mr. Hardy—particularly when considering that Officer Garland's version of events is more consistent with Wichgers' (*see* PPFF ¶ 14 and Def.'s Resp. thereto)—the Court must adopt Officer Garland's testimony for the purpose of deciding this summary judgment motion.

[3]The defendants argue that Mr. Hardy had merely exited his vehicle, and was not walking towards his mother's house at the time of the events. (*See* Def.'s Resp. to PPFF ¶¶ 19, 21). However, the parties have submitted conflicting deposition testimony on this topic; the Court may not weigh it, and so views the evidence in Mr. Hardy's favor.

performed a warrant check to discover whether Mr. Hardy had any outstanding warrants, and readily observed that he was not with Kirksey. (PPFF ¶¶ 18, 20).[4] Moreover, there were no drugs clearly visible on Mr. Hardy's person—and a later search would establish that Mr. Hardy did not have any drugs on him throughout this entire ordeal—and Mr. Hardy did not smell like marijuana. (PPFF ¶ 27; *see* PPFF ¶¶ 28–29).[5] With those important points in mind, the Court now returns to recounting the relevant events.

After returning to his car at the officers' request, Hardy seems to have spoken with the officers for a very short period of time, asking why they were stopping him. (PPFF ¶¶ 25).[6] In response, the officers did not even

---

[4]The defendants dispute this, arguing that the Court should credit Gasser's recollection of being told that Mr. Hardy was involved in drug dealing. (Def.'s Resp. to PPFF ¶¶ 18, 20). The Court cannot do so. Moreover, the remaining information that defendant tries to rely on to establish suspicion of involvement in criminal activity—that Mr. Hardy hangs out with the suspect they were looking for, that Mr. Hardy was on probation, and that Mr. Hardy hangs out in an area where people deal drugs (Def.'s Resp. to PPFF ¶ 18)—is hardly probative of criminal activity. In actuality, as the Court will discuss further below, this information is extremely non-particularized. Regardless, reading the record in Mr. Hardy's favor, the Court accepts these proposed facts.

[5]The defendants try to justify the officers' actions by arguing that there is evidence that Mr. Hardy smelled of marijuana. (*See* Def'.s Resp. to PPFF ¶¶ 27). In support, they cite only Officer Gasser's self-serving deposition testimony that he smelled marijuana—a fact that he did not include in the incident report he filled out on the day of Mr. Hardy's arrest. (PPFF ¶¶ 28–29). The Court, of course, cannot weigh the evidence, here, but suffice it to say that the defendants stretch their credibility by seeking to have the Court credit Mr. Gasser's testimony. As with most factual aspects of this case, this must be presented to a jury.

[6]The defendants deny this fact, but assert only that neither officer could recall what was said during the conversation. (Def.'s Resp. to PPFF ¶ 25). Seeing as the defendants have not set out any credible evidence that truly calls into question Mr. Hardy's proposed fact, the Court, again, views the record in Mr. Hardy's favor and adopts his version of the events.

mention Kirksey—the trespassing subject whose whereabouts the officers were nominally investigating. (PPFF ¶ 26).[7]

Instead, Officer Gasser simply ordered Mr. Hardy to submit to a search, instructing Mr. Hardy to put his arms out and pushing Mr. Hardy against the car. (PPFF ¶¶ 30–31). While performing this search—in public, on the street—Officer Gasser reached down Mr. Hardy's pants and touched Mr. Hardy's bare buttocks. (PPFF ¶ 33). Officer Gasser then moved his hand to the front of Mr. Hardy's pants and grabbed Mr. Hardy's penis. (PPFF ¶ 34). Throughout this period, Officer Garland was in the proximity and could observe the search taking place; he did nothing to stop the search. (PPFF ¶¶ 35–36).[8]

Perhaps frightened by this under-the-clothes genital search, Mr. Hardy ran from the officers. (PPFF ¶ 37). The officers pursued Mr. Hardy through Mayflower Court, and apprehended him in less than forty-five seconds. (PPFF ¶¶ 38–39). Mr. Hardy maintains that he did not have any drugs on his person throughout these events; the defendants disagree, asserting that, after Mr. Hardy ran from the officers, he discarded a bag of narcotics, which was picked up by a person in a white car. (*See* PPFF ¶ 40, and Def.'s Resp. thereto).[9]

_____

[7] The defendants do not dispute this fact, but instead simply try to muddle it with other, irrelevant representations.

[8] The defendants' and Mr. Hardy's versions of events on all of these points conflict. The Court credits Mr. Hardy's version at this stage of the proceedings.

[9] The resolution of this dispute will boil down to the credibility of the parties' statements and evidence; the Court cannot resolve the question at this time. As with every other factual assertion at this stage, though, the Court must view the record and draw all reasonable inferences in Mr. Hardy's favor; therefore, the Court will credit his version of events at this stage of the proceedings.

Officer Garland apprehended Mr. Hardy at gunpoint, at which point he handcuffed Mr. Hardy and searched Mr. Hardy again. (PPFF ¶¶ 41–43). Officer Gasser then performed an additional search of Mr. Hardy's waistband, pants, and pockets. (PPFF ¶ 45).

At some point after Mr. Hardy's having been handcuffed and formally arrested, a Milwaukee Police Department conveyance van arrived on the scene. (PPFF ¶¶ 42, 44, 46). Officer Rolando Hernandez drove that van to the scene. (PPFF ¶ 46). Meanwhile, Officers Michael Valuch and Patrick Coe also arrived on the scene. (PPFF ¶ 47).

Officers Hernandez and Garland escorted Mr. Hardy to the conveyance wagon and placed him inside of it. (PPFF ¶ 48). Mr. Hardy was in the van for approximately five minutes, after which time Officer Valuch removed him from the van for an additional search, at Officer Gasser's request. (PPFF ¶¶ 49, 51).

Officer Valuch then conducted that additional search at the back of the van, in public while Mr. Hardy was handcuffed. (PPFF ¶¶ 52, 54). In doing so, he pulled Mr. Hardy's pants to the ground, leaving Mr. Hardy standing with only his underwear to cover his genitals. (PPFF ¶¶ 52–53). While Mr. Hardy was standing with only his underwear on, Officer Valuch pulled the waistband of the underwear away from Mr. Hardy's body and looked down Mr. Hardy's underwear. (PPFF ¶ 53). Throughout this search, Officers Garland, Coe, and Hernandez were present and did not stop the search; moreover, several residents of Mayflower Court were present and saw the

search occurring. (PPFF ¶¶ 56–57).[10] After the search, Officer Valuch placed Mr. Hardy back into the van. (PPFF ¶ 58).

Mr. Hardy sat in the van for another ten to fifteen minutes, after which time Officer Valuch again removed Mr. Hardy from the van to perform another search, in public at the back of the van. (PPFF ¶¶ 60, 63). Officer Valuch again pulled Mr. Hardy's pants down, and this time grasped Mr. Hardy's penis over his underwear. (PPFF ¶ 61). Officer Valuch then looked into Mr. Hardy's underwear. (PPFF ¶ 62). Officers Gasser, Garland, Coe, and Hernandez observed this search and did not stop it; at least one of Mr. Hardy's neighbors observed this search. (PPFF ¶¶ 65, 66).[11] Officer Valuch then again returned Mr. Hardy to the van.

The officers then took Mr. Hardy to the Fifth District police station, whereafter he was transferred to the Criminal Justice Facility. (PPFF ¶ 69).

Officers Gasser and Garland, likewise, returned to the Fifth District police station. (PPFF ¶ 70). Once there, they prepared incident reports regarding the events in question. (PPFF ¶ 70). As the Court already mentioned, the officers' reports did not include any mention of being told

---

[10]The defendants dispute all of these proposed facts, but primarily disagree with Mr. Hardy as to whether Officer Valuch pulled Mr. Hardy's pants down. (*See* Def.'s Resp. to PPFF ¶¶ 52–58). As with most everything else the Court has discussed, this determination relies on a weighing of the evidence; the Court cannot resolve the dispute at this point, and therefore views the record in Mr. Hardy's favor.

[11]The defendants dispute whether this additional search occurred, and—seemingly—if it did occur, whether Officer Valuch pulled down Mr. Hardy's pants to effectuate the search. (*See* Def.'s Resp. to PPFF ¶¶ 60–68). Because this determination requires weighing the evidence, the Court cannot decide it at this stage, and resolves it in Mr. Hardy's favor.

that Mr. Hardy was involved in drug activity nor of Mr. Hardy's smelling like marijuana. (PPFF ¶ 70).

Mr. Hardy was eventually charged with resisting or obstructing an officer, pursuant to Wis. Stat. § 946.41(1), as a result of his having run from Officer Gasser's first search. (PPFF ¶ 71). He was held in the Criminal Justice Facility for 21 days, during which time he reported the allegedly improper searches to his parole officer, who eventually made a formal complaint on his behalf, which was found to be baseless. (PPFF ¶¶ 72–74). Eventually, after being held in the Criminal Justice Facility for 21 days, Mr. Hardy apparently pled guilty to resisting or obstructing an officer, and was then released. (*E.g.*, Docket #86, Exs. 1–3).

### 2.2 Legal Background

Mr. Hardy filed this suit on July 10, 2013. (Docket #1). He filed an amended complaint on February 5, 2014, which serves as the operative complaint and contains the following claims:

(1) a due process claim against all of the defendants, for allegedly depriving Mr. Hardy of his liberty and violating his right to bodily integrity (Compl. ¶¶ 29–33);

(2) a Fourth Amendment claim—presumably for both the initial stop and also the strip search—against the defendant officers (Gasser, Garland, Hernandez, Coe, and Valuch), for violating Mr. Hardy's right to be free from unreasonable searches and seizures (Compl. ¶¶ 34–40);

(3) a false arrest claim against the defendant officers for detaining Mr. Hardy without justification and probable cause;

(4) a failure to intervene claim against all of the defendants, for their failures to stop the illegal searches and arrests in spite of their knowledge thereof (Compl. ¶¶ 41–45);

(5)     a conspiracy claim against the defendant officers, for their prior agreements to violate Mr. Hardy's rights (Compl. ¶¶ 51–56); and

(6)     an indemnification claim, seeking to require the City of Milwaukee to indemnify its employees, who are defendants in this matter (Compl. ¶¶ 57–59).

The defendants moved for judgment on the pleadings on Mr. Hardy's complaint, which the Court denied on February 25, 2014.

Now, the defendants have jointly moved for partial summary judgment, seeking dismissal of a number of Mr. Hardy's claims. (Docket #50, #77).

Specifically, the defendants request that the Court dismiss

(1)     any claims regarding unknown defendants (Def.'s Br. in Supp. at 18), for failure to satisfy 42 U.S.C. § 1983's requirements;

(2)     Mr. Hardy's due process claim (Def.'s Br. in Supp. at 19–20), because the claim is not supported by the record;

(3)     any claims over Officers Coe, Valuch, and Hernandez for lack of jurisdiction (Def.'s Br. in Supp. at 20–21);

(4)     the false arrest claims against Officers Coe, Valuch, and Hernandez, because they did not arrest Mr. Hardy (Def.'s Br. in Supp. at 21);

(5)     the Fourth Amendment claim (presumably, along with the false arrest claim) against Officers Gasser and Garland, because they had reasonable suspicion to stop Mr. Hardy and probable cause to arrest him (Def.'s Br. in Supp. at 21–24);

(6)     the Fourth Amendment and false arrest claims against Officers Gasser and Garland, because those two officers are entitled to qualified immunity on those claims (Def.'s Br. in Supp. at 24–27);

(7)     the Fourth Amendment claims against Officers Garland, Coe, and Hernandez, because those officers did not perform any allegedly unlawful searches (Def.'s Br. in Supp. at 27); and

(8)    the conspiracy claim against all of the officers, for lack of evidence of conspiracy (Def.'s Br. in Supp. at 28–29).

Mr. Hardy concurs with or does not dispute several of the defendants' arguments. Specifically, he has:

(1)    agreed to dismiss his due process claim (Pl.'s Resp. at 27);

(2)    conceded that Officers Coe, Valuch, and Hernandez were not present at the time of Mr. Hardy's arrest, and therefore that his false arrest claim and his Fourth Amendment claim for unlawful stop against those officers, must be dismissed (Pl.'s Resp. at 10, n.3); and

(3)    not objected to the defendants contention that he cannot maintain his claim against the unknown defendants (*see generally*, Pl.'s Resp.), and therefore he has waived any argument that he should be permitted to maintain such claims, *e.g.*, *Diadenko v. Folino*, 741 F.3d 751, 757 (7th Cir. 2013) (finding that party waived consideration of issue before a district court by failing to raise issue in her summary judgment materials).

Moreover, the defendants have agreed that Officers Coe, Valuch, and Hernandez have now been served and have answered the complaint, giving the Court jurisdiction over them.

Thus, the first four of the defendants' arguments are moot. Likewise, the Court must grant summary judgment in the defendants' favor on: Mr. Hardy's due process claim; his claims against any unknown defendants; his false arrest claim against Officers Coe, Valuch, and Hernandez; and his Fourth Amendment claim for unlawful stop against those defendants.

3.    DISCUSSION

With that background in mind, there remain four issues for the Court to address. *First*, whether Officers Gasser and Garland had reasonable suspicion to stop Mr. Hardy, such that they cannot be held liable on Mr. Hardy's Fourth Amendment unlawful stop claim, and whether they had

probable cause to arrest Mr. Hardy, such that they cannot be held liable on Mr. Hardy's false arrest claim. *Second*, whether Officers Gasser and Garland are entitled to qualified immunity on those two claims. *Third*, whether the Court must dismiss the Fourth Amendment illegal search claims against Officers Garland, Coe, and Hernandez, because those officers did not actually perform the allegedly-illegal searches, and whether the Court must dismiss the failure to intervene claims against all officers, because those officers did not see the strip searches occurring. *Fourth*, whether the Court must dismiss the conspiracy claim in its entirety for lack of evidence. The Court addresses each of these issues in turn.

### 3.1 Fourth Amendment Unlawful Stop and False Arrest Claims Against Officers Gasser and Garland

This first issue actually involves to sub-issues: whether Officers Gasser and Garland were justified in stopping Mr. Hardy and whether they were justified in arresting him.

#### 3.1.1 Unlawful Stop

The Court clearly cannot dismiss Mr. Hardy's Fourth Amendment unlawful stop claims against Officers Gasser and Garland because there are significant disputes of material fact surrounding that claim. Police officers may not perform investigatory stops of individuals without a reasonable, articulable suspicion that criminal activity is afoot, as judged by an objective inquiry into all of the circumstances the officer knows at the time of the stop. *See, e.g.*, *Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir. 2014); *United States v. Snow*, 656 F.3d 498, 500 (7th Cir. 2011); *United States v. Riley*, 493 F.3d 803, 808 (7th Cir. 2007) (quoting *United States v. Lawshea*, 461 F.3d 857 859 (7th Cir. 2006)).

The defendants offer five reasons that Officers Gasser and Garland had a reasonable, articulable suspicion to perform an investigatory stop, but each of those reasons fails to establish a reasonable, articulable suspicion. The first— that Wichgers had told them that Mr. Hardy was engaged in the sale of drugs—is not established by the evidence, seeing as Officers Gasser and Garland testified in inconsistent ways on the fact. Moreover, even if it was established, the defendants have not offered any case law to show that such a generalized statement would create the particularized sort of suspicion necessary to perform an investigatory stop. *See United States v. Williams*, 731 F.3d 678, 684 (7th Cir. 2013) (citing *United States v. Arvizu*, 534 U.S. 266, 273); *Huff*, 744 F.3d at 1004 looking for "reasonable articulable suspicion that [the defendants] had committed, were committing or were about to commit an offense.").[12] The second, third, and fourth reasons offered by the defendants—that Mr. Hardy was on probation; that Wichgers told the officers that Mr. Hardy hangs out with Kirksey; and that Mr. Hardy hangs out in an area known for illegal activity—likewise fail to create a reasonable articulable suspicion. If such facts could support a reasonable articulable suspicion, then: every parolee could be stopped at any time; any person who associated with suspects of crimes could be stopped for investigative reasons; any person living in or visiting a high-crime area would be subject to such stops. These are all very slippery slopes that the Court does not wish to traverse.

The only reason that could potentially satisfy the reasonable articulable suspicion requirement is the fifth—that the officers could smell

---

[12]If the defendants disagree, they may provide the Court with case law to support their position prior to trial, at which time the Court may reconsider the issue.

marijuana on Mr. Hardy. *See, e.g.*, *United States v. Peters*, 743 F.3d 1113 (7th Cir. 2014); *United States v. Clark*, 657 F.3d 578 (7th Cir. 2011); *United States v. Franklin*, 547 F.3d 726, 734-35 (7th Cir. 2008) (all of these cases standing for the proposition that the smell of marijuana creates *probable cause* to perform a search). The problem is that there are significant factual issues that must be resolved regarding this fact: the only evidence offered by the defendants in favor of this assertion is Officer Gasser's sole and self-serving testimony that he smelled marijuana, which conflicts with Mr. Hardy's testimony, and is not supported by the officers' incident reports.

Thus, at this point, the Court must deny the defendants' motion for summary judgment on Mr. Hardy's Fourth Amendment unlawful stop claims against Officers Gasser and Garland. To the extent that the defendants can establish that Mr. Hardy smelled of marijuana, then they had a reasonable articulable suspicion to stop him; if they cannot establish that fact, then they did not have the required suspicion and their stop of him (as well as the subsequent search of his person) was illegal. This is, thus, a material fact that remains for the jury to decide. *See, e.g.*, *Huff*, 744 F.3d at 1004–05 (citing with approval district court's decision on summary judgment that genuine issue of material fact remained whether officer perceived a traffic violation, such that he had reasonable articulable suspicion to make a stop); *United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010) (citing *United States v. Burnside*, 588 F.3d 511, 516 (7th Cir. 2009) for proposition that reasonable suspicion involves a question of fact, particularly when "what happened?" is at issue).

To end this portion of the discussion, the Court must address the defendants' argument that—though not made explicitly clear—Mr. Hardy was not the subject of an investigative stop. (*See* Def.'s Reply at 5). The

defendants state that "[n]othing prevents a law enforcement officer from approaching a citizen to ask him or her questions if the citizen is free to walk away." (*See* Def.'s Reply at 5). The defendants are correct, as they also are in their assertion that a "person is seized for Fourth Amendment purposes" only when "a reasonable person would have concluded that he is not free to leave police custody." (*See* Def.'s Reply at 5 (*Hardrick v. City of Bolingbrook*, 522 F.3d 758, 762 (7th Cir. 2008))). Be that as it may, the defendants have failed to set out any cogent facts to establish that Mr. Hardy felt that he was free to leave. In fact, the evidence suggests that is emphatically *not* the case, here: the deposition testimony that has been submitted, in fact, seems to show that—without any attempt to approach Mr. Hardy in a non-Fourth Amendment/non-investigatory stop fashion—Officer Gasser immediately decided to perform a search of Mr. Hardy. Any reasonable person who is made to submit to a pat-down search will believe that he or she is not free to leave. To the extent that the defendants are attempting to argue that the officers approached Mr. Hardy lawfully without intending to stop him, at which time they smelled marijuana and *then* decided to stop him and search him, then they circle back around to the exact same place they are left above: the smell of marijuana remains disputed and is an issue for trial.

### 3.1.2   False Arrest

The defendants' arguments that the Court must dismiss Mr. Hardy's false arrest claims against Officers Gasser and Garland are extremely complex—more complex than the defendants seem to realize.

If the officers had probable cause to arrest Mr. Hardy, then the Court must dismiss his false arrest claim against them. *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713–714 (7th Cir. 2013) (probable cause is an absolute defense to a false arrest claim). "Probable cause to justify an arrest exists if the totality

of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Id.*, at 714 (citing *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir.2012); *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). This requires "more than a hunch," but not "a finding that it was more likely than not that the arrestee was engaged in criminal activity." *Abbott*, 705 F.3d at 714 (citing *Henry v. United States*, 361 U.S. 98, 102 (1959); *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010)). It is a purely objective inquiry, requiring an examination of how a reasonable officer would act, knowing what the arresting officer knew at the time of the arrest. *Abbott*, 705 F.3d at 714 (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *Whren v. United States*, 517 U.S. 806, 813 (1996); *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *Tebbens v. Mushol*, 692 F.3d 807, 817 (7th Cir. 2012)).

The defendants make two separate arguments regarding the false arrest claim, both boiling down to an alleged lack of probable cause. First, they argue that Mr. Hardy should be precluded from arguing a lack of probable cause, where he previously pled guilty to resisting arrest. Second, they argue that the facts surrounding Mr. Hardy's arrest establish that the officers had probable cause to arrest him. The Court addresses each of these arguments in turn.

### 3.1.2.1 Preclusion by Plea

In their reply brief, the defendants seek to establish probable cause by using Mr. Hardy's plea agreement to the resisting a police officer charge for preclusive effect. (Def.'s Reply 2–3). In other words, the defendants argue that, because Mr. Hardy pled guilty to that charge, he has essentially

admitted that the officers had probable cause to arrest him. (Def.'s Reply 2–3). In support, the defendants cite only one case: *Allen v. McCurry*, 449 U.S. 90, 102 (1980). And, to be sure, that case *does* allow common law preclusion rules to apply in 42 U.S.C. § 1983 case. *Id.* The problem is that this issue is *extremely* nuanced. The defendants have entirely ignored that nuance, failing to submit appropriate arguments or evidence to support their preclusion-related argument, thus dooming their motion for summary judgment in this regard.

The Court starts its analysis by noting that, while *Allen*, 449 U.S. at 102, certainly does *allow* for a plea agreement to have preclusive effect in a 42 U.S.C. § 1983 action, it does not—under any circumstances—*compel* such effect in this case. Since Mr. Hardy pled guilty in Wisconsin state court, the Court must look to Wisconsin's law of preclusion to determine what effect his plea should be given. *Reynolds v. Jamison*, 488 F.3d 756, 762-63 (7th Cir. 2007) (preclusive effect of Illinois plea agreement must be analyzed under Illinois law) (citing *Allen*, 449 U.S. at 101). *See also Cannaday v. Sandoval*, 458 F. App'x 563, 566 (7th Cir. 2012) (citing 28 U.S.C. § 1738; *Allen*, 449 U.S. at 95–96). In *Mrozek v. Intra Fin. Corp.*, the Wisconsin Supreme Court declined to give a plea agreement preclusive effect. 2005 WI 73, ¶¶ 17–21, 281 Wis. 2d 448, 699 N.W.2d 54. In that case, before engaging in a thorough discussion of legal authority and the facts of the case, the Wisconsin Supreme Court stated, "we conclude that Mrozek's guilty pleas do not fulfill the 'actually litigated' requirement for issue preclusion." *Id.*, at ¶ 21. Thus, the Court cannot be sure whether it should read *Mrozek* for the bright-line rule that guilty pleas cannot *ever* be used for preclusive effect, or whether each guilty plea must be analyzed, individually, under Wisconsin's preclusion law to determine its effect. *See, id.*

Regardless, even accepting that *Mrozek* stands for the proposition that guilty pleas *may* be used for preclusive effect, *cf. Reynolds v. Jamison*, 488 F.3d 756, 765-66 (7th Cir. 2007) (under Illinois law, "any preclusive effect of a guilty plea on subsequent litigation must be determined on a case-by-case basis"), it would still be defendants' burden to establish that the guilty plea is entitled to preclusive effect under Wisconsin law. *Masko v. City of Madison*, 2003 WI App 124, ¶ 4, 265 Wis. 2d 442, 665 N.W.2d 391 ("The party seeking to use issue preclusion bears the burden of demonstrating that the doctrine should be applied.") (citing *State ex rel. Flowers v. H & SS Dept.*, 81 Wis.2d 376, 389, 260 N.W.2d 727 (1978)).

To establish that issue preclusion applies under Wisconsin law, the defendants would have to satisfy two separate steps. At the first step, they would have to show that the guilty plea required an actual adjudication of the issue of probable cause or of facts that would establish probable cause. *See, e.g.*, *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 773 (7th Cir. 2013) (citing *Mrozek* for the proposition that "the question of fact or law that is sought to be precluded actually must have been litigated in a previous action and [have been] necessary to the judgment."). *See also McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009) (examining elements of a crime to determine whether guilty plea preclusively established probable cause). At the second step, the defendants would have to convince the Court that "it is fundamentally fair to employ issue preclusion given the circumstances of the particular case at hand," using some or all of a list of five factors described

by the Wisconsin Supreme Court. *See, e.g.*, *First Weber Grp.*, 738 F.3d at 773; *Michelle T. v. Crozier*, 173 Wis. 2d 681, 689, 495 N.W.2d 327, 330–31 (1993).[13]

The defendants have not even begun to recognize, much less appreciate, the necessary depth of this analysis, nor have they attempted to meet *their* burden to establish issue preclusion. The Court must, therefore, deny their request for summary judgment on this basis of Mr. Hardy's guilty plea.

They may still attempt to establish preclusion, but, if they wish to do so, they should be sure to pay close attention to the following provisos. First, they will have to provide cogent evidence and analysis in support of such a request. Second, they should be aware that there are various reasons that the Court is reluctant to grant preclusive effect to a plea agreement. To begin, the *Mrozek* court noted the fact that the guilty plea, there, did not satisfy the actually litigated step, for reasons that may very well apply to this case. Moreover, the Wisconsin Court of Appeals recently noted that "[a] guilty plea does not necessarily establish an admission of all the facts of the charged

---

[13]The five factors are:

> (1) could the party against whom preclusion is sought, as a matter of law, have obtained review of the judgment; (2) is the question one of law that involves two distinct claims or intervening contextual shifts in the law; (3) do significant differences in the quality or extensiveness of proceedings between the two courts warrant relitigation of the issue; (4) have the burdens of persuasion shifted such that the party seeking preclusion had a lower burden of persuasion in the first trial than in the second; or (5) are matters of public policy and individual circumstances involved that would render the application of collateral estoppel to be fundamentally unfair, including inadequate opportunity or incentive to obtain a full and fair adjudication in the initial action?

*Michelle T.*, 173 Wis. 2d at 689, 495 N.W.2d at 330-31.

crime." *Blake v. Racine Cnty. Human Servs. Dep't*, 2013 WI App 45, ¶ 15, 347 Wis. 2d 499, 831 N.W.2d 439. Therefore, mere admission of guilt does not necessarily prove probable cause (the defendants will have to provide a very cogent analysis of the plea, itself, to establish otherwise). Finally, given the fact that Mr. Hardy may have had a very strong incentive to plead guilty—to be released from confinement—even if he did not commit the crime he was accused of, there may be significant differences in the quality or extensiveness of proceedings that would make application of issue preclusion fundamentally unfair, here.

In other words, while the Court will not foreclose the defendants' opportunity to persuade the Court to employ issue preclusion, here, the defendants should be aware that it will be their burden—and a tall one at that—to establish that the Court should do so.

Finally, on the off chance that the defendants are attempting to argue that *Heck v. Humphrey*, 512 U.S. 477, forecloses Mr. Hardy's ability to seek relief for his false arrest claim, because he is still subject to a state judgment that has not been nullified, the Seventh Circuit has emphatically rejected such a position. *Reynolds*, 488 F.3d at 766-67 (notwithstanding *Heck*, "a claim for false arrest, because it does not by its nature call into question the validity of a conviction, may go forward immediately, without nullification of the underlying criminal conviction") (citing *Booker v. Ward*, 94 F.3d 1052, 1056 (7th Cir.1996); *Wallace v. City of Chicago*, 440 F.3d 421, 423 (2006), *aff'd*, 549 U.S. 384 (2007)).

In sum, defendants have fallen far short of satisfying the Court that Mr. Hardy's guilty plea should prevent him from proceeding on his false arrest claim. While the Court will allow the defendant to brief this issue

further, if they wish to do so, it certainly cannot find that this is a sufficient basis for granting summary judgment at this stage.

### 3.1.2.2 Factual Basis for Probable Cause

The defendants also argue, purely on the factual record and regardless of the preclusion issue, that Officers Gasser and Garland had probable cause to arrest Mr. Hardy. If they are correct, of course, then the Court must dismiss Mr. Hardy's false arrest claim against those officers, because probable cause is an absolute bar to a false arrest claim. *Abbott*, 705 F.3d at 713–714.

The argument is essentially this: Mr. Hardy fled from the officers, necessitating a foot chase; thus, when he was apprehended the officers clearly had probable cause to arrest him for resisting or obstructing an officer in violation of Wis. Stat. § 946.41(1). The Court disagrees.

To reach that conclusion, the Court begins with the pertinent text of the statute: "whoever knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority is guilty of a Class A misdemeanor." Wis. Stat. § 946.41(1). The Court can identify four elements in that text: (1) resistance or obstruction of an officer, occurring while the officer (2) was acting in official capacity and (3) with lawful authority, and (4) further that the act was done knowingly.

As already mentioned, probable cause exists where "the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbot*, 705 F.3d at 714 (citing *Thayer*, 705 F.3d at 246; *DeFillippo*, 443 U.S. at 37; *Beck*, 379 U.S. at 91). Thus, the question becomes whether the totality of the facts

known at the time would convince a reasonable person that Mr. Hardy violated Wis. Stat. § 946.41(1).

The Court will take as a given that the totality of the circumstances would give any reasonable person reason to believe that Wis. Stat. § 946.41(1)'s first and second elements are satisfied. To be sure, Mr. Hardy actually did resist or obstruct arrest by running away from the officers. Moreover, both officers were acting in their official capacity. The Court will also assume *arguendo* that the officer had reason to believe that Mr. Hardy was acting knowingly, given that they were not privy to his internal thought processes, but had reason to believe he was acting volitionally.

The problem for this portion of the defendants' argument, however, is in the third element. That element requires that, for an individual to have violated Wis. Stat. § 946.41(1), the officer who arrested that individual must have been acting "with lawful authority" while doing so. In this case, the parties dispute whether Officers Gasser and Garland were acting with lawful authority when they stopped and searched Mr. Hardy. Moreover, there is still a dispute over whether that search was an obviously-illegal strip search. Any reasonable person confronted with those alleged facts—their lack of authority to stop and search Mr. Hardy and their doing so in a clearly illegal and violative fashion—would know that Mr. Hardy was not, in fact, violating Wis. Stat. § 946.41(1). This conclusion is further buttressed by the Supreme Court's statement in *United States v. Di Re*, 332 U.S. 581, 594 (1948), that "One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases." This is the proper case. Any contrary determination would allow police officers apparent authority to arrest any person for fleeing an arrest, even if those officers were acting totally unlawfully in effectuating an arrest. That rule would lead to absurd and

unjust results, and, therefore, the Court rejects the defendants' argument in this regard.

Nonetheless, this decision does not close the probable cause determination in its entirety. In fact, probable cause may exist. If, for example, the record ultimately establishes that Mr. Hardy *did* smell of marijuana and the officers had reasonable suspicion to stop and search him, and likewise that their search was not an unlawful strip search, then they likely were acting with lawful authority. In that case, they would likewise have had probable cause to arrest Mr. Hardy. These are all fact-bound determinations, though, better left for trial.

Accordingly, Mr. Hardy's false arrest claims cannot be dismissed on this basis.

### 3.2 Qualified Immunity for Officers Gasser or Garland on Fourth Amendment and False Arrest Claims

The defendants next argue that Officers Gasser and Garland are entitled to qualified immunity on Mr. Hardy's Fourth amendment and False Arrest claims against them.

To resolve a question of qualified immunity, the Court must engage in a two-prong inquiry. The first prong requires the Court to decide whether the facts, "[t]aken in the light most favorable to the party asserting the injury, …show the officer's conduct violated a [federal] right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second prong requires the Court to answer whether the right in question was "clearly established" at the time of the violation, such that the state of the law at the time of the incident provided fair warning to the defendants that their conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 739, 741 (2002). In performing this analysis, the Court must be sure not to resolve genuine factual disputes in favor of the party seeking

summary judgment. *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004) (*per curiam*); *Saucier*, 533 U.S. at 201; *Hope*, 536 U.S. at 733, n.1.

The facts, here, are so radically in dispute that the Court cannot find the officers are entitled to qualified immunity. Taking the facts in Mr. Hardy's favor, he clearly states Fourth Amendment and false arrest claims. He asserts that he was stopped and searched without cause, which would clearly violate his Fourth Amendment rights. He asserts that Officer Gasser performed a strip search during that first stop, which would also clearly violate his Fourth Amendment rights. Finally, he asserts that his arrest resulted from the officers' own unlawful activity in effectuating the arrest, making his arrest unlawful. On this latter point, the Court finds that, if Mr. Hardy's version of events is correct, then the officers did not even have *arguable* probable cause to arrest him, because they would clearly have known that their arrest was illegal, as it was based upon their own illegal search of Mr. Hardy. Finally, the Court points out that all of these violations—if Mr. Hardy can establish that they, in fact, occurred—violated clearly established law at the time they occurred. No one can doubt that such unlawful stops, searches (including strip searches), and illegal arrests were clearly prohibited at the time this activity occurred, as such outrageous conduct is obviously unconstitutional. *E.g.*, *Safford Unified Sch. Dis. v. Reding*, 557 U.S. 364, 377 (2009) (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

For all of these reasons, the defendants' qualified immunity argument also fails.

### 3.3 Fourth Amendment Illegal Search Claims Against Officers Garland, Coe, and Hernandez and Failure to Intervene Claims Against All Officers

The defendants next argue that Officers Garland, Coe, and Hernandez cannot be held liable for the strip search because they did not actually perform the strip search. If Mr. Hardy opposes this portion of the defendants' motion, the Court cannot find where in his brief he did so, although he noted in a footnote that his strip-search related claims against Officers Garland, Coe, and Hernandez relate only to those officers' failure to intervene. (Pl.'s Resp. at 27 n.7).

So, to clarify this point: to the extent Mr. Hardy had a claim against Officer Garland, Coe, or Hernandez for actively participating in a strip search, he has effectively waived that claim, and it must be dismissed.

On the other hand, the Court cannot dismiss Mr. Hardy's failure to intervene claims. The defendants' only argument in favor of dismissal of those claims is that all of the officers testified that they did not see any other officer perform a strip search. (Def.'s Reply at 4). In doing so, they again make the mistake of requesting that the Court credit their evidence over Mr. Hardy's and draw reasonable inferences in their favor. Mr. Hardy testified that he was strip searched in the presence of other officers, from which the Court can reasonably infer that the officers observed the unlawful conduct, knowing it was unlawful[14] and did nothing to stop it, despite an opportunity to do so. Thus, crediting Mr. Hardy's testimony and drawing inferences in his favor, the Court must sustain Mr. Hardy's failure to intervene claims through this motion for summary judgment.

---

[14]As discussed more fully above, they would have known that such activity was unlawful.

Of course, the evidence at trial may show that Mr. Hardy is incorrect, but, again, all of this is a question of fact rather than law. The Court must, therefore, deny the City's motion for summary judgment on the failure to intervene claims.

### 3.4    Conspiracy Claim

The defendants' motion to dismiss Mr. Hardy's conspiracy claim is complicated by the fact that the defendants had not turned over all relevant documents at the time they moved for summary judgment on the claim. Rather, as Mr. Hardy points out, even at the time he filed his response brief, he still had not received potentially-relevant documents. Mr. Hardy, therefore, requested additional time to gather evidence, under Federal Rule 56(d), before opposing the defendants' motion for summary judgment on the conspiracy claim. (Pl.'s Resp. at 22–26). The defendants tried to short-circuit that request by providing limited information about the additional materials—which they have now turned over to Mr. Hardy—and arguing that the materials are irrelevant.

They may very well be correct, but the Court finds it would be inappropriate to grant summary judgment on that basis without offering Mr. Hardy an opportunity to respond. Therefore, the Court will deny this portion of the defendants' motion for summary judgment without prejudice. The Court will revisit the issue, at the parties' request, prior to trial.

### 4.    CONCLUSION

In sum, there are significant factual disputes remaining to be resolved, which largely prevent the Court from granting the defendants' motion for summary judgment. Specifically, the Court is obliged to deny the defendants' motion to the following extent:

(1) the Court must deny the defendants' motion for summary judgment on Mr. Hardy's Fourth Amendment illegal stop and search and false arrest claims against Officers Gasser and Garland, because the Court cannot give Mr. Hardy's plea agreement preclusive effect, find probable cause, or grant qualified immunity at this summary judgment stage of the proceedings (*see* Section 3.1 and Section 3.2, *supra*);

(2) the Court must deny the defendants' motion for summary judgment on Mr. Hardy's failure-to-intervene claims against all of the officers, because there is conflicting evidence as to whether the officers observed illegal strip searches occurring (*see* Section 3.3, *supra*); and

(3) the Court must deny the defendants' motion for summary judgment on Mr. Hardy's conspiracy claims, because Mr. Hardy has not had an adequate opportunity to respond to the defendants' motion, having just recently received discovery (*see* Section 3.4, *supra*).

On the other hand, the Court is obliged to grant summary judgment in the defendants' favor on a number of claims that Mr. Hardy either agreed should be dismissed or ignored, as follows:

(1) Mr. Hardy agreed to dismiss his due process claim (Pl.'s Resp. at 27), and therefore the Court grants the defendants' motion for summary judgment on that claim (*see* Section 2.2, *supra*);

(2) Mr. Hardy conceded that Officers Coe, Valuch, and Hernandez were not present at the time of Mr. Hardy's arrest (Pl.'s Resp. at 10, n.3), and therefore the Court must grant the defendants' motion for summary judgment on his false arrest claim and his Fourth Amendment claim for unlawful stop against those officers, must be dismissed (*see* Section 2.2, *supra*); and

(3) Mr. Hardy did not object to the defendants contention that he cannot maintain his claim against the unknown defendants (*see generally*, Pl.'s Resp.), and therefore he has waived any argument that he should be permitted to maintain such claims, *e.g.*, *Diadenko v. Folino*, 741 F.3d 751, 757 (7th Cir. 2013) (finding that party waived consideration of issue before a district court by failing to raise issue in her summary judgment materials),

and the Court must grant the defendants' motion for summary judgment on that claim (*see* Section 2.2, *supra*); and

(4)     Mr. Hardy stated that his strip-search related claims against Officers Garland, Coe, and Hernandez relate only to those officers' failure to intervene, (Pl.'s Resp. at 27 n.7), and therefore the Court must grant the defendants' motion to dismiss Mr. Hardy's claims against those officers to the extent Mr. Hardy sought relief under a theory that those officers had actually participated in a strip search (*see* Section 3.3, *supra*).

As should be quite clear, there are still very significant factual issues remaining for trial. If they have not yet done so, it is time for the parties to get serious about their preparations for that trial and to work with one another to resolve disputes where possible, so as to streamline the presentation of their respective cases to the Court and the jury.

Accordingly,

IT IS ORDERED that, as more fully discussed above, the defendants' motion for partial summary judgment (Docket #50) be and the same is hereby GRANTED in part and DENIED in part.

Dated at Milwaukee, Wisconsin, this 13th day of June, 2014.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge