LEO HARDY,

    Plaintiff,

CASE NO. 13-CV-769-JPS

v.

CITY OF MILWAUKEE, OFFICER MICHAEL GASSER, OFFICER KEITH GARLAND, JR. and OFFICER MICHAEL VALUCH, JR.,

    Defendants.

**BRIEF IN SUPPORT OF DEFENDANTS' RULE 59(E) MOTION TO AMEND OR ALTER THE JUDGMENT**

Defendants, City of Milwaukee, Officer Michael Gasser, Officer Keith Garland, Jr. and Officer Michael Valuch, Jr. ("Defendants"), by and through their attorneys, Crivello Carlson, S.C., submit this Brief in Support of their Motion to Amend the Judgment entered against Defendants, pursuant to Fed. R. Civ. P. 59(e).

### RELIEF REQUESTED

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, the Defendants request that the Court enter an order amending or altering the August 21, 2014 Judgment (Docket No. 210) due to manifest errors of law as follows:

    1)    Eliminating the $250,000.00 in punitive damages awarded to the Plaintiff from Officer Gasser;

    2)    Alternatively, reducing the award of punitive damages consistent with federal common law and Officer Gasser's due process constitutional guarantees;

1

3) Eliminating the $250,000.00 in punitive damages awarded to the Plaintiff from Officer Garland;

4) Alternatively, reducing the award of punitive damages consistent with federal common law and Officer Garland's due process constitutional guarantees; and

5) Eliminating the Judgment and award of $1,000.00 in compensatory damages in favor of the Plaintiff and against Officer Gasser and Officer Garland relative to the false arrest claim based on the Plaintiff's testimony that established the existence of probable cause for the arrest as a matter of law.

## **BACKGROUND**

This case arises out of events that occurred on March 13, 2012. Plaintiff, Leo Hardy, claimed that his constitutional rights were violated when he was stopped, searched and arrested by Officer Michael Gasser, Officer Keith Garland, Jr. and Officer Michael Valuch, Jr. After a four-day trial, the jury returned the following verdict:

> Question No. 1: At the time of his initial stop of Mr. Hardy, did Officer Gasser have a reasonable suspicion that Mr. Hardy was committing, had committed, or was about to commit a crime?
>
> Answer: No.
>
> Question No. 2: Setting aside any questions regarding the nature of Officer Gasser's search of Mr. Hardy, did Officer Gasser have reasonable suspicion that he or another was in danger of physical injury, so as to support a frisk or pat-down search of Mr. Hardy?
>
> Answer: No.
>
> Question No. 3: What amount of money, if any, do you award to fairly and reasonably compensate Mr. Hardy for being stopped and frisked by Officer Gasser?
>
> Answer: $2,500.

2

Question No. 4: At the time of his initial stop of Mr. Hardy, did Officer Garland have a reasonable suspicion that Mr. Hardy was committing, had committed, or was about to commit a crime?

    Answer: No.

Question No. 5: What amount of money, if any, do you award to fairly and reasonably compensate Mr. Hardy for being stopped by Officer Garland?

    Answer: $2,500.

Question No. 6: Did Officer Gasser conduct a search of Mr. Hardy in an unreasonable manner?

    Answer: No.

Question No. 7 is left unanswered.

Question No. 8 is left unanswered.

Question No. 9 is left unanswered.

Question No. 10 is left unanswered.

Question No. 11 is left unanswered.

Question No. 12: At the time he arrested Mr. Hardy, did Officer Gasser have probable cause to believe that Mr. Hardy had committed a violation of the law?

    Answer: No.

Question No. 13: At the time he arrested Mr. Hardy, did Officer Garland have probable cause to believe that Mr. Hardy had committed a violation of the law?

    Answer: No.

Question No. 14: What amount of money, if any do you award to fairly and reasonably compensate Mr. Hardy for being arrested without probable cause by Officer Gasser and Officer Garland?

    Answer: $1,000.

Question No. 15: Did Officer Valuch conduct a search of Mr. Hardy in an unreasonable manner?

    Answer: No.

Question No. 16 is left unanswered.

Question No. 17 is left unanswered.

Question No. 18 is left unanswered.

Question No. 19 is left unanswered.

Question No. 20 is left unanswered.

Question No. 21 is left unanswered.

Question No. 22 is left unanswered.

Question No. 23 is left unanswered.

Question No. 24 is left unanswered.

Question No. 25: Was the conduct of Officer Gasser malicious or in reckless disregard of Mr. Hardy's rights?

    Answer: Yes.

Question No. 26: What amount of money, if any, do you award against Officer Gasser as punitive damages?

    Answer: $250,000.

Question No. 27: Was the conduct of Officer Garland malicious or in reckless disregard of Mr. Hardy's rights?

    Answer: Yes.

Question No. 28: What amount of money, if any, do you award against Officer Garland as punitive damages?

    Answer: $250,000.

Question No. 29 is left unanswered.

Question No. 30 is left unanswered.

(Trial Tr., vol. 4, 987-989 August 7, 2014).

Following the trial in this matter, Mr. Hardy was successful on two of his claims, but was unsuccessful on the series of claims that he focused most intently on. Through the testimony elicited by the Plaintiff at trial, it was clear that the focus of Mr. Hardy's case was on attempting to establish that the manner in which the officers searched him violated the Fourth Amendment. Mr. Hardy provided graphic testimony and alleged groping, grabbing and physical exposure that he claimed caused him to feel "humiliated, degraded and assaulted." (Trial Tr. vol. 1 109 lines 23, 112 lines 3, 134 lines 8-9 August 4, 2014). However, the jury expressly rejected this testimony and concluded that the manner that the search was conducted was **not** unreasonable.

The jury did rule in favor of Mr. Hardy on two aspects: 1) the officers' stop of Mr. Hardy and the decision to conduct a pat-down search; and 2) false arrest. The testimony and evidence relative to these two successful claims was very different than the testimony offered regarding the manner in which the search was allegedly conducted.

With regard to the decision to make the stop and conduct the initial pat-down search, Officers Gasser and Garland claimed to have had information that Mr. Hardy was on probation and potentially involved in drug dealing. As such, the officers claimed that their initial stop and pat-down was not motivated by evil intent directed towards Mr. Hardy, but rather what they believed to be reasonable suspicion. (Trial Tr. vol. 3, 715 lines 14-17, 716 lines 9-14 August 6, 2014); (Trial Tr. vol. 3, 663 lines 3-21 August 6, 2014). Additionally, the evidence presented at trial indicated that neither Officer Gasser nor Officer Garland knew Mr. Hardy prior to this incident. (Trial Tr. vol. 1, 185 lines 23-25, 186 lines 1-3 August 4, 2014). The absence of evil motive was further supported by the **undisputed**

5

testimony of how quickly the officers responded and the lack of premeditation. According to Officer Garland:

> We immediately exited our vehicle, and we didn't have to think about it. We didn't have a chance to activate our emergency lights or sirens to record. It was just instinct to get out and make sure that we approach him to make sure that he didn't have a weapon.

(Trial Tr. vol. 3, 666 lines 15-19 August 6, 2014).

Mr. Hardy's testimony to counter the officers' testimony was simply that: 1) he did not commit any traffic violations; and 2) he did not smoke or smell like marijuana. (Trial Tr. vol. 1, 105 lines 8-12, 109 lines 6-20 August 4, 2014). Mr. Hardy presented **no** testimony or evidence to suggest, much less prove, the officers' had improper motive or intent or reckless or callous indifference in making the decision to conduct the stop and the initial pat-down search.

With regard to the arrest, as will be argued further below, the evidence introduced at trial does not support a claim for false arrest. During his testimony, Mr. Hardy himself admitted that he fled from the police after the initial stop and pat down search. (Trial Tr. vol. 1, 143 lines 13-21). In light of the jury's ruling on the manner of the search, the officers had probable cause for the arrest as a matter of law.

## STANDARD OF REVIEW

A party may move to alter or amend a judgment after it has been entered pursuant to Fed. R. Civ. P. 59(e). "Rule 59(e) allows a party to direct the district court's attention to…a manifest error of law or fact, and enables the court to correct its own errors and thus avoid unnecessary appellate procedures." *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996).

6

**ARGUMENT**

**I. The Punitive Damages Awards Should be Eliminated or Reduced**

As this Court is aware, it has considerable discretion in setting aside or reducing an award of punitive damages. *Allahar v. Zahora*, 59 F.3d 693, 697 (7th Cir. 1995). In reviewing the award of punitive damages and the amount of the damages, the presumption is that Mr. Hardy was made whole by the compensatory damages awarded to him by the jury. *State Farm Mutual Automobile, Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). The jury's finding of an unreasonable stop and false arrest does not warrant an award of punitive damages, nor does the evidence presented at trial justify such an award.

**A. Punitive Damages Standard**

The standard for punitive damages is a high one: "Punitive damages are appropriate when the defendant acted wantonly and willfully, or was motivated in his actions by ill will or a desire to injure." *Hendrickson v. Cooper*, 589 F.3d 887, 894 (7th Cir.2009) (quoting *Hagge v. Bauer*, 827 F.2d, 101, 110 (7th Cir.1987)). Punitive damages must only be awarded if the defendant's wrongdoing is so reprehensible to warrant the imposition of further sanctions to achieve punishment or deterrence. *State Farm*, 538 U.S. at 419. In the context of a § 1983 case, a plaintiff must prove that the defendant was "motivated by evil motive or intent or [showed] reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). A punitive damages award "may not constitute merely a windfall to the prevailing party." *Allahar*, 59 F.3d at 696.

**B. The Award of Punitive Damages Should be Reduced to $0**

In this case, the jury's punitive damages award does not fit the evidence presented by Plaintiff at trial and therefore constitutes nothing but a mere windfall to Plaintiff. The

7

alleged outrageous conduct to which Plaintiff testified at trial surrounded the manner in which he alleged that he was searched by Officers Gasser and Valuch. Mr. Hardy testified that the alleged groping, grabbing and physical exposure caused him to feel "humiliated, degraded and assaulted." (Trial Tr. vol. 1 109 lines 23, 112 lines 3, 134 lines 8-9 August 4, 2014). It is possible that this alleged conduct could justify an award of punitive damages. However, **the jury did not believe Mr. Hardy's testimony regarding the search** and instead found that the manner in which Plaintiff was searched was not unreasonable as a matter of law. (Trial Tr. vol. 4, 988 lines 2-4, 23-25).

Instead, on the question of the existence of reasonable suspicion for the stop and the decision to conduct a pat-down, the jury ruled in favor of Mr. Hardy and awarded him $2,500 in compensatory damages against Officer Gasser and another $2,500 against Officer Garland. (Trial Tr. vol. 4, 987 lines 14-17, 23-25, 988 lines 1, 18-22 August 7, 2014). The jury then also found in favor of Mr. Hardy on his claim for false arrest and awarded a mere $1,000 in damages. Then, despite the understated evidence relative to the stop and the decision to conduct a search, the jury went on to award a total of $500,000 in punitive damages against Officer Gasser and Officer Garland. (Trial Tr. vol. 4, 989 lines 13-15, 19-21 August 7, 2014).

In order to obtain an award of punitive damages, Mr. Hardy had the burden of presenting evidence of "evil motive or intent" or "reckless or callous indifference" by the officers with respect to the decision to conduct the stop and the decision to conduct an initial search. *Smith*, 461 U.S. at 56. Instead, the testimony and evidence reflects that Officers Gasser and Garland had information that Mr. Hardy was on probation and potentially involved in drug dealing. As such, according to the officers, the initial stop and pat-down

8

was not motivated by evil intent, but rather reasonable suspicion. (Trial Tr. vol. 3, 715 lines 14-17, 716 lines 9-14 August 6, 2014); (Trial Tr. vol. 3, 663 lines 3-21 August 6, 2014). Importantly, Mr. Hardy never challenged the underlying motives or intent of the officers to conduct the stop and pat-down. Instead, Mr. Hardy's testimony to counter the officers' version of events was simply that: 1) he did not commit any traffic violations; and 2) he did not smoke or smell like marijuana. (Trial Tr. vol. 1, 105 lines 8-12, 109 lines 6-20 August 4, 2014).

However, while the jury ultimately concluded that the officers did not have reasonable suspicion for the stop or the decision to conduct the pat-down search, Mr. Hardy never presented any evidence to dispute or counter the **motive** of the officers to conduct the stop or the decision to conduct a pat-down. For example, the evidence presented at trial indicated that neither Officer Gasser nor Officer Garland knew Mr. Hardy prior to this incident. (Trial Tr. vol. 1, 185 lines 23-25, 186 lines 1-3 August 4, 2014). The absence of evil motive was further supported by the **undisputed** testimony of how quickly the officers responded and the lack of pre-meditation. According to Officer Garland:

> We immediately exited our vehicle, and we didn't have to think about it. We didn't have a chance to activate our emergency lights or sirens to record. It was just instinct to get out and make sure that we approach him to make sure that he didn't have a weapon.

(Trial Tr. vol. 3, 666 lines 15-19 August 6, 2014).

The foregoing testimony is consistent with the Supreme Court's recognition that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving…" *Graham v. Connor*, 490 U.S. 386, 397 (1989). Even viewing the evidence regarding the initial stop and the decision to conduct a pat-down

9

search in a light most favorable to Mr. Hardy, there is no legal basis for the imposition of punitive damages.

Moreover, with regard to the arrest, the award of punitive damages is also inappropriate. The evidence and testimony revealed that Plaintiff's arrest was based on the fact that Plaintiff ran from Officers Gasser and Garland at the initial stop. (Trial Tr. vol. 3, 738 lines 8-12 August 6, 2014). Plaintiff testified at trial:

> Q: And at that point you fled from the police correct?
>
> A: Correct.
>
> Q: And you indicated that you fled pretty much straight forward across the hilly mound area that's in the center of Mayflower Court, correct?
>
> A: Correct.
>
> Q: All right. And you said you wanted to just get away from him and separate yourself from him, correct?
>
> A: Correct.

(Trial Tr. vol. I, 143 lines 13-21 August 4, 2014).

If a person flees officers, even from an unlawful stop, such flight from the officers provides probable cause to arrest that person. *See United States v. Sledge*, 460 F.3d 963, 966-67 (8th Cir. 2006).

There is no evidence or testimony to support a punitive damages award against Officer Gasser or Officer Garland with regard to their decision to conduct the stop of Mr. Hardy, their decision to conduct a pat-down or the arrest of Mr. Hardy. While Mr. Hardy did present testimony of egregious conduct in this case, that testimony all related to the manner in which he alleged he was searched, which the jury ruled in favor of the officers on. Accordingly, the punitive damages award in the Judgment should be amended to $0.

10

### C. If the Punitive Damages are not Excluded from the Judgment, They Should be Reduced

Even if this Court finds that the punitive damages were appropriately assessed, the $500,000 awarded was unwarranted and indicative only of the jury's prejudice, sympathy or bias. This excessive punitive damages award is contrary to federal common law and also violates Defendant Gasser's and Garland's due process rights. As such, the punitive damages award should be remitted significantly or decided at a new trial limited to those damages.

#### 1. Federal Common Law Should Limit Punitive Damages to a 1:1 Ratio

Constitutional torts, such as Mr. Hardy's claim pursuant to 42 U.S.C. § 1983, "are governed by federal common law, subject to the authority of Congress to legislate otherwise." *Mendez v. County of San Bernadino*, 540 F.3d 1109, 1122 (9th Cir. 2008) (citing *Smith*, 461 U.S. at 34). With regard to punitive damages, the federal common law of damages governs the scope of punitive damages in § 1983 actions. *See Erwin v. County of Manitowoc*, 872 F.2d 1292, 1299 (7th Cir. 1989). The Supreme Court has also directed that damage remedies in Section 1983 claims are determined by evaluating the "common law of torts (both modern and as of 1871)." *Smith*, 461 U.S. at 34.

While the Supreme Court has not yet expressly identified a federal common law limit on punitive damages in civil rights claims, it seems likely that a common law limit (in addition to the constitutional limit addressed below) exists. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 501-502 (2008) ("Our review of punitive damages today, then, consider not their intersection with the Constitution, but the desirability of regulating them as a common law remedy for which responsibility lies with this Court as a source of judge-made law in

the absence of statute"). Indeed, even before the Supreme Court's decision in *Baker*, the Seventh Circuit Court of Appeals recognized that in addition to a constitutional challenge to an excessive punitive damages award, a party may challenge the award based on common law principles. *See Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 971 (7th Cir. 1983).

In *Baker*, the Supreme Court evaluated the punitive damages awarded in the aftermath of a highly intoxicated captain failing to properly navigate Exxon's *Valdez* oil tanker, which ultimately led to 11 million gallons of crude oil spilling into Prince William Sound. *Id.* at 478-479. In developing common law in this area, the Supreme Court surveyed the states' limitations of punitive damages remedies and considered whether it was best to set a specific dollar amount to cap punitive damages or whether to adopt a maximum ratio of the amount of acceptable punitive damages compared to compensatory damages. *Id.* at 506-512. Ultimately, the Court concluded that it was most prudent to develop common law to limit punitive damages by using a ratio. The Court then determined that the appropriate ratio should be 1:1. *Id.* at 513.

The Supreme Court's holding in *Baker* expressly ruled that the 1:1 ratio was the maximum amount of punitive damages to be permitted under common law for <u>maritime</u> cases. *Id.* However, notwithstanding that limitation, the basis for establishing a common law cap on the award of punitive damages is the same here as it was in limiting the punitive damages imposed against Exxon. A common law limit on the award of punitive damages serves the important role of placing consistent limits on punishments that are administered in modern civil law. *Id.* at 499-500.

The creation of such limitation has desirable consequences in the consistent administration of civil justice. In ruling on *Baker*, the Supreme Court recognized research that established that the median ratio of punitive to compensatory damages was 0.65:1. *Id.* at 513. In establishing a 1:1 ratio cap, which was higher than that historical ratio, the Court ensured measured and predictable consequences to deter and punish wrongdoers.

As the Court in *Baker* did, it is also instructive to consider how states have limited the award of punitive damages. With regard to Section 1983 lawsuits, the Supreme Court recognized that "[t]here can be no doubt that claims brought pursuant to § 1983 sound in tort." *Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999). For that reason, Wisconsin's $200,000 or 2:1 ratio cap on punitive damages recoverable by a plaintiff may also warrant consideration by the Court. *See* Wis. Stat. § 895.043(6).

As was the case that confronted the Supreme Court in *Baker*, a well-settled common law limitation on punitive damages seems to elude courts and litigants. Since federal common law provides the basis for Section 1983 remedies and since Congress has failed to address this issue directly, it is once again left to the courts to develop common law in this area. The Supreme Court's rationale and analysis and *Baker* applies equally to the facts of this case and as such, the Defendants respectfully request that the Court extend *Baker*'s 1:1 ratio limit to the punitive damages assessed in this Section 1983 case.

### 2. The Punitive Damages Award Violates Due Process

In addition to common law limitations on punitive damages, the Supreme Court has also ruled that excessive punitive damages awards may also violate due process. The United States Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 581 (1996) and its progeny, *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 425

13

(2003), has held that the ratio between punitive damages and compensatory damages should be less than 10 to 1. "Single-digit multipliers are more likely to comport with due process, while still achieving the… goals of deterrence and retribution." *State Farm*, 538 U.S. at 425.

In assessing the appropriateness and size of a punitive damage award, the Supreme Court has also directed courts to consider three guideposts: (1) the reprehensibility of the defendant's misconduct; (2) the relationship between the amount awarded and the harm or potential harm suffered by the plaintiff; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases. *See BMW*, 517 U.S. at 575; *State Farm*, 538 U.S. at 418*; see also G.G. v. Grindle*, 665 F.3d 795, 798 (7th Cir. 2011) (in determining reasonableness of the award, courts consider whether "(1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence…; and (3) whether the award is roughly comparable to awards made in similar cases.")

In the case at bar, the reprehensibility prong does not support the imposition of a $500,000 punitive damages award. Plaintiff has made no showing of a physical injury. Plaintiff has alleged that he was humiliated, degraded and assaulted by the police officers during the searches; however, the jury apparently did not credit that testimony and found that the searches were not unreasonable. There has been no showing of indifference or reckless disregard for the health or safety of Mr. Hardy at the initial stop and pat-down and the subsequent arrest. Nor has there been a showing of intentional malice with regards to these events.

In addition to analyzing the degree of reprehensibility of the defendant's conduct, "courts must ensure that the measure of punishment is both reasonable and proportionate to

14

the amount of harm to the plaintiff and to the general damages recovered." *State Farm*, 538 U.S. at 426. As explained above, the Supreme Court in *State Farm* indicated that "few awards exceeding a single-digit ratio between punitive and compensatory damages…will satisfy due process." *Id.* at 425. In this case, the jury awarded Plaintiff $6,000 in compensatory damages and $500,000 in punitive damages for a ratio of approximately 83-to-1[1]. There were no physical injuries and any harm suffered by Mr. Hardy as a result of the initial stop and pat-down was accounted for in the compensatory damages awarded by the jury. Rather, the punitive damages award in this case exceeds what was required to serve any objectives of deterrence and punishment.

Although award comparisons are sometimes not dispositive given the fact-specific nature of damages claims, it is a useful exercise in the due process calculation. *See Hendrickson v. Cooper*, 589 F.3d 887, 892 (7th Cir. 2009). A comparison of punitive damages awarded in cases involving search and seizure and false arrest demonstrates that the award in this case was excessive and should be reduced in order to comport with due process. *See e.g. McKinley v. Trattles*, 732 F.2d 1320, 1227-28 (7th Cir. 1984) (finding that $6,000 or less was an appropriate remittitur for a $15,000 punitive damages award for an improper prison strip search); *Kimbrew v. Evansville Police Dept.*, 867, F.Supp. 818, 831 (S.D. Ind. 1994) (holding that a punitive damages award in the amount of $2,500 was warranted for an unlawful search and seizure); *Ratliff v. City of Chicago*, No. 10-cv-739, 2013 WL 3388745, * 5 (N.D. Ill., July 8, 2013) (upholding jury's award of $15,000.75 and $5,000 in punitive damages against officers for false arrest and illegal search and seizure).

---

[1] If the compensatory damages for the arrest are removed as sought by the Defendants, the ratio would be 100-to-1.

Even in the excessive force context, the punitive damages claims do not come close to what was awarded in the instant case where there were no physical injuries. *See e.g. Bogan v. Stroud*, 958 F.2d 180, 182, 186 (7th Cir. 1992) ($7,000 punitive damages award against three prison officers who beat and stabbed an inmate); *Hagge v. Bauer*, 827 F.2d 101, 104, 110 (7th Cir. 1987) ($25,000 punitive damages award against a police officer who broke the leg of an arrestee); *Taliferro v. Augle*, 757 F.2d 157, 159, 162 (7th Cir. 1985) ($25,000 punitive damages award against two police officers who beat an arrestee); *Kunz v. DeFelice*, 538 F.3d 667, 671, 679 (7th Cir. 2008) ($90,000 punitive damages award where multiple police officers beat arrestee and later beat out a false confession); *Marshall ex rel. Gossens v. Teske*, 284 F.3d 765, 768-69, 772-73 (7th Cir. 2002) ($100,000 punitive damages award against three officers who chased a minor at gunpoint, arrested him and detained him for several hours without probable cause).

In deciding whether a punitive damages award violates due process, courts also consider civil and criminal penalties that could be imposed for comparable conduct. *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 840 (7th Cir. 2013) (quoting *BMW*, 517 U.S. at 583). There are no civil or criminal penalties for an unjustified stop or pat-down search that come anywhere close to the amount of punitive damages awarded in this case.

In light of the foregoing analysis, Defendants respectfully request that this Court exclude the punitive damages awarded from the Judgment or, in the alternative, significantly remit the awards to comport with the strictures of common law and due process.

16

Case 2:13-cv-00769-JPS   Filed 09/18/14   Page 16 of 19   Document 225

## II. The Judgment Should be Amended to Correct an Error of Law and Reflect that the Arrest of Mr. Hardy Was Based on Probable Cause as a Matter of Law

In answering the special verdict, the jury found that Officer Garland and Officer Gasser did not have probable cause to believe that Plaintiff had committed a violation of the law. (Trial Tr. vol. 4 987-989). However, Mr. Hardy himself admitted that he fled from the police. (Trial Tr. vol. 1, 143 lines 13-21). If a person flees, even from an unlawful stop, the act of fleeing provides probable cause to arrest that person. *See Sledge*, 460 F.3d at 966-67.

In *U.S. v. Green*, 111 F.3d 515, 523 (7th Cir. 1997), the Seventh Circuit held that while the initial stop of an individual was not justified, "the intervening circumstances in [the] case [dissipated] any taint of the evidence obtained during the search of the automobile, which was justified as a search incident to an arrest." In reaching that conclusion, the Seventh Circuit Court of Appeals looked to cases from the Fifth, Eighth and Eleventh Circuits for guidance. *Id*. at 521.

> While there is no case law directly on point, *United States v. Nooks,* 446 F.2d 1283 (5th Cir.1971), *United States v. Dawdy,* 46 F.3d 1427, 1431 (8th Cir.1995), and *United States v. Bailey,* 691 F.2d 1009 (11th Cir.1982), are closely analogous and support our conclusion. These cases involved situations where the defendant's original seizure was arguably unconstitutional, but after the initial illegal stop, circumstances developed giving the police probable cause to lawfully arrest the defendants. In arresting the defendants, the police conducted searches incident to the arrests and found incriminating evidence. The defendants argued that the evidence was inadmissible as tainted by the original unlawful seizure. The Fifth, Eighth, and Eleventh Circuits disagreed. In *Nooks* the Fifth Circuit held that evidence obtained following a lawful arrest was admissible as a search incident to an arrest, even though the lawful arrest followed an originally illegal detention. *Nooks,* 446 F.2d at 1288. Similarly, in *Dawdy* the Eighth Circuit held that assuming *arguendo* the "initial stop and arrest of Dawdy were invalid, Dawdy's resistance provided independent grounds for his arrest, and the evidence discovered in the subsequent searches of his person and his automobile is admissible." *Dawdy,* 46 F.3d at 1431. Likewise in *Bailey,* the Eleventh Circuit held that the evidence discovered during a search incident to a second lawful arrest was admissible even

17

> though the original seizure was unconstitutional. *Bailey,* 691 F.2d at 1018–19.

*Id.* at 521-522.

The same rationale applies here. Even if the jury found the initial stop and pat-down to be unconstitutional, Plaintiff's flight from Officers Gasser and Garland "provided independent grounds for his arrest." *See Dawdy*, 46 F.3d at 1431.

Further, even if the evidence in this case could support a verdict of false arrest, governmental officials performing discretionary functions are shielded from liability so far as their conduct does not violate any clearly established constitutional rights of which a reasonable official would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1992); *Hinnen v. Kelly*, 992 F.2d 140, 142 (7th Cir. 1993). An official is entitled to immunity if, when he acted, "he reasonably could have believed that his action did not violate a clearly established law." *Cham v. Wodnick*, 123 F.3d 1005, 1008 (7th Cir. 1997), *cert. denied*, 522 U.S. 1117 (1998). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In this case, based on Mr. Hardy's admission that he fled the officers, Officer Garland and Officer Gasser should also be afforded qualified immunity for the arrest based on the lack of any clearly established law finding a false arrest where the suspect fled officers at the scene.

As such, the Judgment should be amended or altered to correct the manifest error of law within the jury's verdict. With regard to Mr. Hardy's claim relative to his arrest, the Judgment should be altered to reflect that Officer Garland and Officer Gasser had probable cause to arrest Mr. Hardy as a matter of law.

18

Case 2:13-cv-00769-JPS Filed 09/18/14 Page 18 of 19 Document 225

## **CONCLUSION**

Based on the foregoing, Defendants respectfully request that this Court amend or alter the Judgment as described herein.

Dated this 18th day of September, 2014.

                                       By: /s/ Samuel C. Hall, Jr.
                                            SAMUEL C. HALL, JR.
                                            State Bar No. 1045476

                                            Attorneys for Defendants, City of Milwaukee, Officer Michael Gasser, Officer Keith Garland, Jr. and Officer Michael Valuch, Jr.

                                            CRIVELLO CARLSON, S.C.
                                            710 North Plankinton Avenue, Suite 500
                                            Milwaukee, Wisconsin 53203
                                            Phone – (414) 271-7722
                                            Fax – (414) 271-4438
                                            shall@crivellocarlson.com