# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LEO HARDY,

                       Plaintiff,

v.                                                                Case No. 13-CV-769-JPS

CITY OF MILWAUKEE,
OFFICER MICHAEL GASSER,
OFFICER KEITH GARLAND, JR., and
OFFICER MICHAEL VALUCH, JR.,                    ORDER

                    Defendants.

The plaintiff, Leo Hardy, filed suit in this case on July 10, 2013. He alleged that a number of Milwaukee Police Department ("MPD") officers stopped him without reasonable suspicion, strip searched him, and falsely arrested him, and that no officer acted to intervene. He sued those officers under 42 U.S.C. § 1983, asserting that the stop, search, arrest, and failure to intervene violated his constitutional rights. Mr. Hardy also sued several MPD supervisors on a supervisory liability theory and the City of Milwaukee ("the City") for indemnification.

Over the course of pretrial proceedings, Mr. Hardy's claims were narrowed substantially. By the time of trial, his claims remained only against Officers Michael Gasser, Keith Garland, and Michael Valuch.[1] Mr. Hardy alleged that Officers Gasser and Garland: stopped him and searched him without reasonable suspicion; strip searched him and/or failed to intervene to prevent the other officer from strip searching him; and falsely arrested

---

[1] Mr. Hardy's indemnification claim against the City also remained outstanding, but the Court will ignore that claim because the City agreed that it would indemnify the defendant officers. (Docket #208).

him. Mr. Hardy asserted that Officer Valuch strip searched him and/or failed to intervene to prevent others from doing so. Mr. Hardy sought compensatory and punitive damages for these alleged violations.

Mr. Hardy took his claims before a jury and prevailed in part. Specifically, the jury found that Officers Gasser and Garland lacked a reasonable suspicion to stop and frisk Mr. Hardy and that they falsely arrested him. However, the jury rejected Mr. Hardy's contention that he had been strip searched and likewise rejected his failure to intervene claims. The jury awarded Mr. Hardy the following damages:

> $5,000.00 in compensatory damages on his stop-and-frisk claims ($2,500.00 apiece against Officers Gasser and Garland);

> $1,000.00 in compensatory damages on his false arrest claim (jointly against Officers Gasser and Garland); and

> $500,000.00 in punitive damages ($250,000.00 apiece against Officers Gasser and Garland).

The City[2] filed post-trial motions. It requests a new trial (Docket #226) or, in the alternative, an altered or amended judgment (Docket #224). In support of its request for a new trial, pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, the City asserts that the Court made several evidentiary errors (Docket #227 at 7–16); that the punitive damages issue should be re-tried (Docket #227 at 16–19); and that the jury was confused or biased (Docket #227 at 20–21). In support of its motion for an altered or amended judgment, pursuant to Rule 59(e), the City argues that the Court should significantly reduce the punitive damages award (Docket #225 at 7–16) and strike the jury's false arrest finding (Docket #225 at 17–18).

---

[2] The Court will hereinafter refer to the remaining defendants as "the City," because the City provided representation for them.

After those motions were fully briefed, the Court held a conference with the parties and, with the parties' consent, referred the case to the assigned magistrate judge for further mediation. (Docket #245, #246). That mediation ultimately proved unsuccessful. (Docket #249, #250).

Thus, the parties' post-trial motions are now before the Court and ready for decision. The Court will address each separately, beginning with the City's motion for a new trial.[3]

1.      RULE 59(a) MOTION FOR A NEW TRIAL

Rule 59(a) provides that the Court "may, on motion, grant a new trial on all or some of the issues…after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). This is generally accepted to mean that the Court "may only order a new trial if the jury's verdict is against the manifest weight of the evidence,…or if for other reasons the trial was not fair to the moving party." *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (quoting *Marcus & Millichap Inv. Servs. v. Sekulovski*, 639 F.3d 301, 313 (7th Cir. 2011); *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010)) (internal quotation marks omitted).

The City's Rule 59(a) motion is rather confusing. It is untethered from the Rule 59(a) standard set forth above. It identifies alleged legal errors that may have affected the fairness of the trial (the Court's evidentiary rulings) and alleged evidence of unfairness (the jury's verdict), but never ties those items together into a cohesive argument in favor of a new trial. Instead, it

---

[3]Rather than provide a detailed factual discussion, the Court will assume the reader's familiarity with its prior orders on substantive motions (Docket #41, #93) and the course of the trial (*see* Docket #214, #215, #216, #217, #218). Where necessary for discussion, the Court will provide relevant facts within its analysis of the issues.

appears that, as Mr. Hardy puts it, the City's "motion for a new trial is at bottom an attempt to remit the jury's punitive damages award." (Docket #238 at 3).

In the end, as best the Court can discern, the City's motion for a new trial relates almost entirely to the fairness aspect of the Rule 59(a) standard. In asserting that the Court committed evidentiary errors, the City is essentially contending that it was deprived of a fair trial because the admitted evidence improperly prejudiced the jury. The City also argues that the size of the award, itself, is evidence that the trial was unfair. Finally, the City posits that the jury was somehow irrational or inflamed, such that the verdict it rendered was unfair.

Despite the City's focus on the fairness aspect of Rule 59(a), the Court will address that Rule's evidentiary aspect, specifically whether the jury's findings were against the manifest weight of the evidence. Thereafter, the Court will address the more important issues regarding fairness.

### 1.1    Weight of the Evidence

For the most part, the City never asserts that the jury's verdict was against the manifest weight of the evidence. Nor could it. The Court should "set aside a verdict as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict." *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 440 (7th Cir. 2009). That high bar has not been met here.

There are several portions of the jury's verdict that the City suggests were against the manifest weight of the evidence: the stop-and-frisk portion; the false arrest portion; and the punitive damages portion.

### 1.1.1 Stop-and-Frisk Claim

In this case, the jury's verdict in Mr. Hardy's favor on the stop-and-frisk claim was entirely supported by the evidence, rather than against it in any way. In the Court's view, a preponderance of the evidence amply demonstrated that Officers Gasser and Garland lacked any reasonable suspicion to stop and search Mr. Hardy.

Officers Gasser and Garland attempted to justify their initial stop of Mr. Hardy by providing shifting reasons for the stop. (*Compare* Docket #215 at 185:7–192:19, *with* Docket #216, 463:15–468:20). Perhaps it was for investigatory purposes (Docket #215 at 225:10–226:23), but then Mr. Hardy should have been free to leave or to decline to cooperate, *see, e.g.*, *United States v. Tyler*, 512 F.3d 405, 409 (7th Cir. 2008), which he was not. Perhaps it was because Officer Gasser smelled marijuana on Mr. Hardy (Docket #215 at 185:7–192:19), but Officer Garland testified that he *did not* smell marijuana (Docket #216 at 464:13–23) and, in the end, no officer found marijuana or drug paraphernalia on Mr. Hardy or in his car (Docket #215 at 191:22–192:15). Perhaps the officers believed that Mr. Hardy was carrying a gun in violation of his probation (*see, e.g.*, Docket #216 at 452:6–9, 465:10–466:8), but the incident report made no mention of such possibility and the officers' actions were not consistent with such a belief (Docket #216 at 465:10–466:8). Mr. Hardy did not commit any crimes or traffic violations. (Docket #216 at 457:2–7).

Given that the officers could not identify any reason for a stop, together with the fact that their inconsistent testimony significantly reduced

their credibility,[4] there was sufficient evidence from which the jury could reach its verdict in favor of Mr. Hardy on his stop-and-frisk claim. Simply put, the evidence showed that the officers did not know—at the time of the stop *or* at the time of trial—why they stopped Mr. Hardy. The Court finds it exceedingly likely that Officers Gasser and Garland did not formulate their offered justifications until after the stop and search of Mr. Hardy had already occurred. The verdict evidences the jury's reasoned belief that this was the case.

For these reasons, the Court concludes that there was sufficient evidence to support the jury's verdict on Mr. Hardy's stop-and-frisk claims. To the extent that the City's motion suggests otherwise, the Court must deny it.

### 1.1.2   False Arrest Claim

In its motion for a new trial, the City argues (rather obliquely) that the jury's false arrest finding is against the manifest weight of the evidence. (*See, e.g.*, Docket #227 at 19, 21). This argument, however, relates more to the legal underpinnings of Mr. Hardy's false arrest claim than to the underlying evidence. The City appears to acknowledge this, having set forth the argument in much greater detail in its Rule 59(e) motion to alter or amend the judgment. That being the case, the Court will wait to address the argument until it addresses the City's Rule 59(e) motion in Section 2.1, *infra*.

### 1.1.3   Punitive Damages Award

The jury's award of punitive damages is the only portion of the verdict that the City clearly challenges on the basis of the sufficiency of the

---

[4]The Court notes that the officers' credibility was even further diminished by Mr. Hardy's counsel's powerful examination of them as to why they had Mr. Hardy's car towed. (Docket #215 at 194:15–196:19; Docket #216, 481:25–490:16).

evidence.[5] (*See* Docket #227 at 16–19). The City posits that "Mr. Hardy did not present sufficient evidence to prove evil motive or intent or reckless or callous indifference on the part of Officers Gasser and Garland in the initial stop and the decision to conduct a pat-down search of the Plaintiff." In support, it points out that neither Officer Gasser nor Officer Garland knew Mr. Hardy prior to the day in question and acted quickly in stopping and searching Mr. Hardy. (Docket #227 at 18 (citing Docket #215 at 185:23–186:3; Docket #217 at 666:15–19)).

Under the *Smith* standard for punitive damages in 42 U.S.C. § 1983 cases, "[a] jury may award punitive damages…in § 1983 actions when it finds conduct motivated by evil intent or involving reckless or callous indifference to the federally-protected rights of others." *Erwin v. Cty. of Manitowoc*, 872 F.2d 1292, 1299 (7th Cir. 1989) (citing *Smith v. Wade*, 461 U.S. 30, 45–49 (1983)). *See also Marshall ex rel. Gossens v. Teske*, 284 F.3d 765, 772 (7th Cir. 2002) (citing *Colter v. Vitale*, 882 F.2d 1286, 1289 (7th Cir. 1989)). This standard is satisfied when the "defendant actually derive[d] satisfaction from hurting the plaintiff," or, "while not having any particular desire to hurt the plaintiff, trample[d] on the plaintiff's rights in a fashion that can fairly be called reckless, to accomplish his own aims." *Soderbeck v. Burnett Cty., Wis.*, 752 F.2d 285, 289 (7th Cir. 1985). In *Kolstad v. American Dental Ass'n*, the Supreme Court expounded upon the *Smith* standard and used it in the context of 42 U.S.C. § 1981a claim. *Kolstad*, 527 U.S. 526, 534–36 (1999) ("We gain understanding of the meaning of the terms 'malice' and 'reckless

---

[5]In analyzing this issue, the Court's focus is upon determining whether the evidence in this case allows for an award of punitive damages against Officers Gasser and Garland—*not* whether the amount of the award issued by the jury was appropriate.

indifference' as used in § 1981a, from this Court's decision in *Smith*[, 461 U.S. 30].") *Kolstad* noted that *Smith* "at a minimum required recklessness in its subjective form." *Kolstad*, 527 U.S. at 536 (citing *Smith*, 461 U.S. at 45–48). The Seventh Circuit, in the context of a 42 U.S.C. § 1981a claim, has further clarified this standard:

> the plaintiff must show that the employer acted with malice or reckless indifference toward the employee's rights under federal law. A plaintiff may satisfy this element by demonstrating that the relevant individuals knew of or were familiar with the anti-discrimination laws but nonetheless ignored them or lied about their discriminatory activities

*E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 835 (7th Cir. 2013) (quoting *Kolstad*, 527 U.S. at 533–46; *Bruso v. United Airlines, Inc.*, 490 U.S. 228, 253 (1989)) (quotations omitted). In applying that formulation to the circumstances of this case, the Court will determine whether the officers "knew of or were familiar with the [Constitutional] laws but nonetheless ignored them or lied about their…activities." *See AutoZone*, 707 F.3d at 835.

With that standard in mind, it is clear that there was sufficient evidence to support a punitive damages award against Officers Gasser and Garland. The officers, having been trained on appropriate police practices, were clearly aware of the Constitutional standard of "reasonable suspicion" necessary for a stop and search. Officer Garland testified to that fact. (Docket #216 at 463:18–24). Yet, despite their awareness of the law, they ignored the law, stopping and searching Mr. Hardy without any reasonable suspicion. *See* Section 1.1.1, *supra*. Thereafter, they lied about their basis for the stop, creating post-hoc justifications for the incident report and rehashing those post-hoc justifications in depositions and at trial. This evidence weighs strongly in favor of an award of punitive damages.

Meanwhile, the Court is not swayed by the City's evidence against the award of punitive damages. To begin, the fact that the officers did not know Mr. Hardy prior to the day in question is largely irrelevant. It may go to the officers' state of mind, but nothing in *Smith* or its progeny require that the officers harbored some specific animus towards Mr. Hardy, himself.[6] *See, e.g.*, *Smith*, 461 U.S. at 45–49; *AutoZone*, 707 F.3d at 835. On the other hand, the officers' quick action is more relevant to the *Smith* determination. It is probative of the fact that, perhaps, in their haste they believed that they had reasonable suspicion to search Mr. Hardy. However, even giving that contention significant credit, the Court still could not find that "no rational jury" could have discounted it to side with the opposing evidence.

In the end, in light of all of the evidence, the Court finds that the jury acted rationally in determining that the officers acted with reckless or callous indifference to Mr. Hardy's rights. There was ample evidence in favor of such a finding and, at best, evidence of slightly lesser weight opposing it. Thus, the jury's award of punitive damages under the *Smith* standard was not against the manifest weight of the evidence. Thus, Rule 59(a) relief on that basis would be inappropriate and the Court will deny the City's motion in that regard.

1.2    Fairness

As the Court has already noted, the main thrust of the City's motion for a new trial is that the trial was not fair, due to erroneous evidentiary rulings or jury confusion or bias. The City also argues that the jury's substantial award of punitive damages is evidence that the trial was unfair.

---

[6]And with good reason; otherwise, defendants could escape punitive damages by showing that they lacked intent to harm any specific person, even if they generally intended serious harm to some random person.

The Court will address each of those arguments in turn. Further, while the City did not specifically argue as much, the Court will address whether the cumulative effect of all of the alleged errors (even if they were harmless, standing alone) justifies a new trial. *See, e.g.*, *Venson v. Altamirano*, 749 F.3d 641, 658 (7th Cir. 2014); *Barber v. City of Chicago*, 725 F.3d 702, 715 (7th Cir. 2013).[7]

In deciding whether a new trial is appropriate, the Court must be guided by the principle that "civil litigants are entitled to a fair trial, not a perfect one"; the Court should decline to order a new trial "unless there was an error that caused some prejudice to the substantial rights of the parties." *Lemons v. Skidmore*, 985 F.2d 354, 357 (7th Cir. 1993) (citing *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 248 (7th Cir. 1975), *cert. denied*, 427 U.S. 912 (1976)).

### 1.2.1   Evidentiary Issues

The City argues that the Court made several evidentiary errors during the course of trial. Specifically, the City challenges the Court's admission of evidence regarding:

(1)   another strip search and related investigation (Docket #227 at 8–10);

---

[7]The Court also notes that the City seems to have raised an argument that Mr. Hardy's closing argument resulted in unfair prejudice. (Docket #227 at 15–16). This argument is waived, as it was never raised during trial so as to give the Court an opportunity to remedy the prejudice. *See Doe by G.S. v. Johnson*, 52 F.3d 1448, 1465 (7th Cir. 1995). It is also waived because the City now raises it in a vague and perfunctory manner. *Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 650 (7th Cir. 2012). Moreover, Mr. Hardy's attorney's argument was accurate and fair. It did not cause any unfair prejudice. For these reasons—each adequate standing alone—the Court will not address this argument separately.

(2)  Officer Gasser's comments on Facebook and his meeting in a park with other officers under suspicion for conducting strip searches (Docket #227 at 10–12);

(3)  Officer Gasser's invocation of the Fifth Amendment and retention of attorney in the context of strip search investigations (Docket #227 at 13–14); and

(4)  the threatening culture of MPD, as recounted by a non-defendant officer (Officer Zachary Thoms), whom Mr. Hardy called as a witness (Docket #227 at 14–15).

The City also challenges the cumulative effect of these evidentiary rulings, arguing that—even if harmless standing alone—the evidentiary errors combined to influence the jury's verdict. (Docket #227 at 15–16).

Before turning to the specifics of those arguments, the Court will set forth the governing principles that apply to the City's post-trial evidentiary challenges.

The most basic of those governing principles are Rules 401 and 402 of the Federal Rules of Evidence, which govern the admissibility of relevant evidence. Rule 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." This is a "low threshold" to satisfy, as the definition of relevance is very broad. *United States v. Boswell*, 772 F.3d 469, 475 (7th Cir. 2014) (citing *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012); *United States v. McKibbins*, 656 F.3d 707, 711 (7th Cir. 2011); *Int'l Merger Acquisition Consultants, Inc. v. Armac Enters., Inc.*, 531 F.2d 821, 823 (7th Cir. 1976)). As long as evidence meets that low relevance threshold and its admission does not run afoul of some other rule or statute, it is admissible under Rule 402. The City argues that the evidence described above did not meet that low threshold and thus was not relevant under Rule 401.

The City also argues that, even if the evidence was relevant under Rule 401, Rule 403 should still have prevented its admission. Rule 403 allows the Court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Ev. 403. The City argues that the challenged evidence was either unfairly prejudicial or confusing.

As to unfair prejudice, the Seventh Circuit has repeatedly reminded the courts that, because "'most relevant evidence is, by its very nature, prejudicial,'…evidence must be *unfairly* prejudicial to require exclusion." *United States v. Hanna*, 630 F.3d 505, 511 (7th Cir. 2010) (quoting *United States v. Thomas*, 321 F.3d 627, 630 (7th Cir. 2003)) (emphasis in original). "'Evidence is unfairly prejudicial only to the extent that it will cause the jury to decide the case on improper grounds.'" *United States v. Khan*, 771 F.3d 367, 377 (7th Cir. 2014) (quoting *United States v. Richards*, 719 F.3d 746, 762–63 (7th Cir. 2013)). This requires a balancing test because "[t]he amount of prejudice that is acceptable varies according to the amount of probative value the evidence possesses." *Boswell*, 772 F.3d at 476 (citing *United States v. Vargas*, 552 F.3d 550, 554 (7th Cir. 2008)).

Rule 403 also calls for exclusion where "the probative value of [a piece of evidence is] substantially outweighed by the risk of jury confusion." *United States v. Fauls*, 65 F.3d 592 (7th Cir. 1995). *See also* Fed. R. Ev. 403; *United States v. Lupton*, 620 F.3d 790, 800 (7th Cir. 2010); *R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*, 462 F.3d 690, 698 (7th Cir. 2006); *Heft v. Moore*, 351 F.3d 278, 284 (7th Cir. 2003).

Even if the Court committed some evidentiary violation, though, it does not necessarily require that the City be granted a new trial. "A new trial

is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury, and the result is inconsistent with substantial justice." *Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005) (internal citation omitted). "Evidentiary errors satisfy this standard only when a significant chance exists that they affected the outcome of the trial." *E.E.O.C. v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 440 (7th Cir. 2012).

### 1.2.1.1 Other Strip Searches and Investigations

The City first attacks the admission of Officer Gasser's testimony regarding a separate strip search performed by another officer that Officer Gasser witnessed and later described as lawful. (Docket #227 at 8). The City argues that the Court should not have allowed this testimony, pursuant to Rules 401 and 403, as the testimony was irrelevant and also unfairly prejudicial or confusing. (Docket #227 at 8–10).

At trial, the Court allowed Mr. Hardy's attorneys to question Officer Gasser regarding a prior strip search. (Docket #115 at 163:20–165:10). Officer Michael Vagnini[8] conducted that prior search with Officer Gasser present. (Trial Ex. 27). Later, two detectives and an FBI agent interviewed Officer Gasser about the incident. (Docket #115 at 164:8–15; Trial Ex. 27). During that interview, Officer Gasser stated that strip searches like the one Officer Vagnini had performed were not unusual and that there was nothing wrong with such searches. (Docket #115 at 164:16–25; Trial Ex. 27).

---

[8]Officer Vagnini was MPD's primary strip-search offender. He is now serving a prison sentence as a result of his criminal actions in improperly searching individuals. He is also a defendant in many of the strip-search cases now pending in this district, although he is not a defendant in this case.

At trial, the City objected to this testimony on the basis of relevance and prejudice. (Docket #115 at 165:6–7). The Court overruled that objection at the time, noting that "[i]t goes to what the witness understood were reasonable and accepted police practices with regard to this sort of police action." (Docket #115 at 165:8–10).

The Court stands by that reasoning in rejecting the City's Rule 401 relevance argument. Mr. Hardy alleged that Officer Gasser strip-searched him. Officer Gasser's previous course of conduct—witnessing a strip search and later stating that such search was not unusual and was, in fact, legal—shows that he believed strip searches were permissible, making it more likely that he conducted a strip search of Mr. Hardy in this case. Thus, the evidence has a "tendency to make a fact [of consequence (the strip search)] more…probable than it would be without the evidence," as required for relevance under Rule 401.

The City makes two arguments against this finding. First, it argues that the evidence could not be relevant because determining the constitutionality of any given search involves "'a fact-specific inquiry that depends upon the way each plaintiff was searched and the security risks presented by each plaintiff.'" (Docket #241 at 5 (quoting *Klein v. Dupage Cty.*, 119 F.R.D. 29, 30 (N.D. Ill. 1988))). That fact-specific inquiry occurred at the trial in this case, and one portion of it involved an inquiry into the individuals who were present at the search. Officer Gasser, who stated his belief that strip searches are permissible, was present at Mr. Hardy's search and allegedly performed a strip search at that time. Thus, even applying the City's narrow lens, the evidence would be relevant. Second, the City argues that the information could not be relevant because it:

does not tend to establish that he lied when he denied putting his hand into Mr. Hardy's pants. Stated differently, under the Plaintiff's theory there actually would have been no reason for Officer Gasser to lie about or attempt to cover up Mr. Hardy's search because, according to the Plaintiff, Officer Gasser was of the belief that the search described by Mr. Hardy was constitutional.

(Docket #241 at 5). But that argument actually goes to the *weight* of the evidence, as opposed to its legal relevance. The fact that Officer Gasser did or did not do something later in time does not undermine the legal relevance of the information. Rather, this was a point that the City could have argued to attempt to undermine the value of the evidence to the jury; it did not do so.[9]

The Court also rejects the City's argument that the evidence was unduly prejudicial or confusing in violation of Rule 403. The City seems to suggest that admission of this evidence was, by its nature, unfairly prejudicial and confused the issues by injecting evidence of other searches.[10] (Docket #241 at 10). To begin, the evidence was not extremely prejudicial. To be sure, it did not cast Officer Gasser's concept of an appropriate search in a good light. It also made clear to the jury that there had been other strip-search incidents involving MPD officers. But that prejudice was not unfair.

---

[9]The Court must also point out that this tactic would likely have been ineffective, given that Officer Gasser made the statement in question very shortly after his search of Mr. Hardy. (*See* Trial Ex. 27).

[10]The City hardly develops its argument regarding prejudice or confusion, spending all of two sentences in its opening brief and concluding without analysis that the evidence must have been prejudicial and confusing. (Docket #241 at 10). This is a common theme of the City's arguments: it raises them and then offers only perfunctory arguments in support. Therefore, the arguments are likely waived, *see e.g.*, *Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 650 (7th Cir. 2012) (undeveloped arguments waived), though the Court will substantively analyze each.

On balance, it did not substantially outweigh the probative value of the evidence. Moreover, this evidence was not confusing. Mr. Hardy's counsel properly clarified at several times that she was asking about a separate incident and was interested in Officer Gasser's concept of an appropriate stop. (*See, e.g.*, Docket #215 at 162:14–163:14, 164:8–25). At bottom, the jury's return of a complete and consistent split verdict displayed its ability to parse the evidence to reach a verdict on each separate claim. It was not confused by this evidence. For these reasons, the Court concludes that the evidence did not violate Rule 403.

### 1.2.1.2 Officer Gasser's Facebook Comments and Meeting

The City next challenges admission of a Facebook post made by Officer Gasser. Officer Gasser wrote the Facebook post after he had been placed on leave as a result of strip search allegations. (Docket #215 at 210:3–210:20). The post was made as a comment to a thread started by someone else, the title of which was "Shit Heads 8, MPD Zero." (Docket #215 at 209:8–14). Officer Gasser's post in that thread included key phrases such as: "everyone still needs to go kick ass and keep up the great work"; how tough it was not to be backing his fellow officers up "and taking people to jail"; and how on his "first day back, [he would] not hesitate to go right back to doing exactly what [he] was doing before. Nothing will change in how [he does his] job." (Docket #215 at 209:15–210:20). The City argues that this evidence is not relevant and was unfairly prejudicial or confusing. (Docket #227 at 10–12).

This evidence was clearly relevant to Mr. Hardy's punitive damages claim. Two factors to consider in awarding punitive damages, as recounted in the Court's jury instructions are "the reprehensibility of the defendant

officers' conduct" and "[t]he likelihood that the defendant officer[] would repeat the conduct if an award of punitive damages is not made." (Docket #203 at 26–27). Those instructions come practically verbatim from the Seventh Circuit's pattern instructions, which themselves are rooted in the Supreme Court's discussion of factors to consider for punitive damages in *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991). Officer Gasser asserted that nothing would change in how he would do his job; made clear his concern with "kick[ing] ass" and "taking people to jail"; he also found it appropriate to post his comment under a thread referring to accusers as shit heads. Altogether, this was evidence that he was likely to repeat his conduct. It was also relevant to show that Officer Gasser viewed people like Mr. Hardy—citizens who have every right to expect officers to follow the law—with contempt, going to Officer Gasser's motivation and the reprehensibility of his conduct. The evidence was relevant under Rule 401.

The City also challenges the Court's admission of evidence related to Officer Gasser's attendance at a meeting with other suspended officers. This meeting occurred four days after Officer Gasser had been suspended and directed not to talk about the strip search allegations. (*See* Docket #215 at 198:23–199:8, 200:7–200:13). Officer Gasser testified that he did attend this meeting but that no one talked about the allegations. (Docket #215 at 198:23–200:6, 201:9–16). The City challenges this evidence as irrelevant and unfairly prejudicial or confusing.

This evidence was also relevant to Mr. Hardy's punitive damages claim. It gave the clear appearance that the officers present, including Officer Gasser, were attempting to coordinate with one another to avoid the consequences of their actions and/or to continue taking such actions. This

would support the reprehensibility and continued-conduct prongs of the punitive damages standard.

Furthermore, neither the Facebook post nor the evidence of the meeting was unfairly prejudicial or confusing. The City's only support for its argument in this regard is its conclusory statement that "confusion, bias, and prejudice is reflected in the punitive damages awarded by the jury." (Docket #227 at 12). The Court disagrees. The jury was clearly able to properly consider the evidence, considering that it rejected Mr. Hardy's strip search claims. The City does not posit any other way in which either the post or Officer Gasser's participation in the meeting caused unfair prejudice or confusion. In any event, because both pieces of evidence were of substantial probative value to the punitive damages claims, the Court would not find it to be outweighed by such prejudice or confusion. The post does not violate the provisions of Rule 403.

### 1.2.1.3 Officer Gasser's Invocation of the Fifth Amendment and Retention of Attorney

The City next challenges the admission of evidence showing that Officer Gasser had invoked the Fifth Amendment and retained an attorney in relation to strip search allegations. Specifically, the Court received testimony that, in relation to the search conducted by Officer Vagnini, described above, Officer Gasser invoked the Fifth Amendment, retained an attorney, and testified only after receiving immunity via a proffer letter. (Docket #217 at 760:19–761:8, 763:13–764:7). He also declined to testify in relation to the investigation of Mr. Hardy's allegations. (Docket #217 at 503:18–506:19). The City challenges this evidence as irrelevant, unfairly prejudicial, and confusing. (Docket #227 at 13–14).

The evidence was relevant under Rule 401. It went to Officer Gasser's credibility. He declined to participate in the initial investigation of Mr. Hardy's allegations—a sharp contrast to his willingness to testify after receiving immunity in the Vagnini-related search. And upon participating in the investigation of Vagnini, he ultimately provided damaging testimony. (*See* Docket #217 at 765:4–766:10). Likewise, here, his initial silence could be viewed as an indication that he held damaging information and was reluctant to provide it without receiving immunity. Granted, he eventually did come around to cooperating in this case, ultimately providing testimony prior to and at trial; thus, perhaps the probative value of his silence was not extremely high. *See Harris v. City of Chicago*, 266 F.3d 750, 753–54 (7th Cir. 2001). But the Court cannot say that this evidence of silence carried no value. Appreciating that this case was largely a credibility contest between Mr. Hardy's and the officers' version of events, Officer Gasser's credibility was a fact of consequence and any source of impeachment was valuable. For these reasons, this evidence satisfies Rule 401.

Furthermore, this evidence was not unduly prejudicial or confusing. Again, the City has provided little analysis with regard to why this evidence violates Rule 403. (*See* Docket #227 at 13–14; Docket #241 at 9–10). Officer Gasser initially refused to testify in the investigation in two separate instances, and that reluctance would have an understandable negative effect on the jury's perception of him. That is prejudicial, but the Court does not believe that such prejudice substantially outweighs the value of the evidence to Officer Gasser's credibility. And, again, the Court cannot cite to any evidence of jury confusion. This is perhaps the closest call under Rule 403. But, even if the evidence *did* violate Rule 403, the lack of resulting prejudice

(which the Court will discuss in Section 1.2.1.6, *infra*) leads the Court to conclude that a new trial is not necessary. *See Cerabio LLC*, 410 F.3d at 994.

### 1.2.1.4 Officer Thoms' Testimony Regarding MPD Culture

The City also challenges the Court's admission of testimony by Officer Zachary Thoms, who testified to threats he had received as a result of cooperating in strip search investigations. (Docket #227 at 14–15). The City objects to that testimony on three grounds.

First, the City argues that Officer Thoms' testimony exceeded Mr. Hardy's offer of proof; this argument fails. The City does not offer any support for the contention that trial testimony cannot exceed an offer of proof, nor can the Court find such authority.

Second, the City argues that Officer Thoms' testimony about threats was outside of the scope of cross-examination. The Court disagrees. The City's attorney attempted to show that Officer Thoms had only testified because he had been given a proffer letter. (Docket #216 at 518:6–11). Mr. Hardy's attorney's questions regarding the threats were germane to undermining the City's theory of Officer Thoms' motivation to testify; that is, while the proffer letter may have helped Officer Thoms to testify, he did so in spite of serious threats, thus reducing the import of the proffer letter.

Third, the City argues that Officer Thoms' testimony was irrelevant and unduly prejudicial; these arguments also fail. The testimony was relevant for the purpose of undermining the City's attempt to paint Officer Thoms as improperly motivated. It was also relevant to show that a code of silence existed that would motivate officers to lie about precisely the same course of strip searches at issue in this case and that Officer Thoms was threatened for testifying about. *See Paradiso v. Obaldo*, No. 07-CV-4247, 2009

WL 3272217 (N.D. Ill. Oct. 8, 2009) (allowing testimony to show that particular officers in particular incidents maintained a code of silence). The evidence also was not unduly prejudicial, as that probative value was not substantially outweighed by any unfair prejudice.

For these reasons, the Court finds that Officer Thoms' testimony was properly admitted. Finally, as the Court discusses further in Section 1.2.1.6, *infra*, the City has not indicated any resulting prejudice (aside from the issue of punitive damages), nor can the Court identify any.

### 1.2.1.5   Cumulative Effect

"'Where there are several errors, each of which is harmless in its own right, a new trial may still be granted if the cumulative effect of those otherwise harmless errors deprives a litigant of a fair trial.'" *Jordan v. Binns*, 712 F.3d 1123, 1137–38 (7th Cir. 2013) (citing *Christmas v. City of Chicago*, 682 F.3d 632, 643 (7th Cir. 2012)). The City argues that this sort of cumulative error occurred in this case. (*See* Docket #227 at 15–16). Again, the Court disagrees.

To begin, this argument fails as a matter of law because it rests on the assumption that there were errors. As the Seventh Circuit's standard states—and as the City acknowledges—it is only when otherwise-harmless *errors* combine to affect the fairness of the trial that the Court must reverse. *Jordan*, 712 F.3d at 1137 ("[w]here there are several errors," new trial may be "granted if cumulative effect of those otherwise harmless errors," resulted in unfair trial.) (*See also* Docket #241 at 12 ("However, if the Court concludes that evidentiary errors were made but that the errors were harmless…")). But here, as already exhaustively documented, the Court has concluded that it did not err in admitting any of the evidence challenged by the City.

Therefore, under the Seventh Circuit's standard, the Court cannot grant Rule 59(a) relief on this basis.

In any event—even assuming that there *were* errors or that non-erroneous admission of evidence *could* result in an unfair trial—the cumulative effect of the Court's evidentiary rulings did not result in an unfair trial and could not warrant Rule 59(a) relief. *See* Section 1.2.1.6, *infra*.

### 1.2.1.6    Lack of Prejudice as to All Evidentiary Claims

Even if the Court erred in admitting any single piece or the cumulation of the evidence, such error did not affect the outcome of the trial, and thus does not justify relief. *See Cerabio LLC*, 410 F.3d at 994.

The Court made clear in its instructions that the jury was to consider "what actually occurred during the search[] conducted by Officer Gasser." (Docket #203 at 18). And the jurors did, indeed, find that there had not been a strip search; thus, this evidence could not have prejudiced the City on the strip search claims.

The evidence also did not prejudice the City with regard to Mr. Hardy's successful stop-and-frisk or false arrest claims. As the Court has already discussed and will discuss further, there was ample evidence supporting those claims. *See* Section 1.1.1, *supra*; Section 2.1, *infra*.

The City's best argument for prejudice is that the jury's punitive damages award was unduly large as a result of prejudicial evidence. The Court disagrees. As the Court discussed above, the evidence clearly showed that the officers had no reason to stop Mr. Hardy. *See* Section 1.1.1, *supra*. The officers, themselves, set off this extremely unfortunate chain of events by acting illegally. The jury could rationally have been very concerned with that fact and rendered a substantial verdict in Mr. Hardy's favor.

The Court also notes that it allowed both sides significant latitude in presenting evidence. For instance, the Court allowed the City to present evidence of Mr. Hardy's alleged prior drug dealing. (*See* Docket #216 at 267:18–268:11). On balance, neither party appeared in a positive light before the jury. Given this level playing field, the Court is obliged to conclude that the trial was fair.

Having concluded that there was no evidentiary error and no resulting harm, the Court is constrained to deny the City's Rule 59(a) motion insofar as the motion relates to the Court's evidentiary rulings.

### 1.2.2    Jury Confusion and/or Bias

The City's next argument in its Rule 59(a) motion is that the jury was confused or biased, thus rendering its verdict unconstitutional under concepts of due process. (Docket #227 at 20 ("Due process guarantees within the Constitution are meant to ensure that jury verdicts are not the product of jury passion, prejudice, or bias.") (citing *Pac. Mut. Life Ins.*, 499 U.S. at 41 (Kennedy, J. concurring))). The City's only valid support for this argument derives from the jury's false arrest finding and substantial punitive damages award. (*See* Docket #227 at 20). The City argues that both are evidence that the jury was confused or biased.

The false arrest claim does not demonstrate confusion or bias. As the Court will discuss further, the jury's verdict on that claim was perfectly reasonable in light of the evidence and the jury instructions. *See* Section 2.1, *infra*.

The punitive damages award, on the other hand, is excessive. Ultimately, the Court is obliged to offer Mr. Hardy the choice between a new trial and a reduced punitive damages award, *see* Section 2.2, *infra*. But the City does not provide any support for (nor even request that) the Court grant

an entirely new trial purely as a result of the excessive punitive damages award. Rather, as is common in cases involving punitive damages, the Court can sever the punitive damages award from the otherwise-reasonable jury verdict and grant remittitur. This is especially appropriate in light of the fact that the only basis for the City's prejudice argument is the size of the award, alone. *See Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co.*, 965 F.2d 1442, 1448-49 (7th Cir. 1992) ("theory…that passion and prejudice may be inferred from the size of the award [is] an unclear proposition.").

The City also argues that negative media reports about MPD and other nationally-reported events involving police could have inflamed the jury, but it offers no evidence for this position. Significantly, the Court conducted a thorough voir dire (*see* Docket #215 at 13:24–14:1), during which no member of the jury panel indicated any form of bias on the basis of media reports (Docket #204 at 2–3). This argument fails.

In sum—aside from the size of the punitive damages award, which the Court will address separately—there is absolutely no evidence to support the City's contention that the jury was biased or confused. The Court will, therefore, deny the City's Rule 59(a) motion insofar as it relies on that argument.

### 1.2.3   Punitive Damages

The City has reserved the bulk of its punitive damages argument for it Rule 59(e) motion. (*Compare* Docket #227 at 16–19 (limited discussion of punitive damages issue in Rule 59(a) brief), *with* Docket #225 at 7–16 (providing more thorough discussion of punitive damages issue in Rule 59(e) brief)). Accordingly, the Court will address this issue in its discussion of the City's Rule 59(e) motion. *See* Section 2.2, *infra*.

### 1.2.4 Cumulative Effect of Multiple Errors

The concept of cumulative error is not confined to evidentiary objections; rather, if multiple otherwise-harmless errors of any sort combined to result in an unfair trial, Rule 59(a) relief may be appropriate. *See, e.g.*, *Venson*, 749 F.3d at 658; *Barber*, 725 F.3d at 715. The City did not explicitly raise this argument. Nonetheless, the Court will address the argument out of an abundance of caution, in hopes of addressing every possible argument that the City may assert (no matter how vague otherwise poorly supported).

Even considering the issue, the Court still determines that the cumulative effect of the proceedings in this case does not warrant Rule 59(a) relief. As with the cumulative evidence argument, the fact that the Court has not identified any errors is enough, alone, to reach that conclusion. *See Venson*, 749 F.3d at 658 (looking for some combination of errors, whereas the Court has not identified errors in this case). Moreover, the Court concludes that the cumulative effect of any errors was harmless. As already discussed, this trial was fair and any prejudice reflected in the punitive damages award can be adequately excised via remittitur. *See* Section 1.2.1.6, *supra*.

As such, the City is not entitled to a new trial on the basis of the cumulative effect of multiple errors.

In sum, aside from a potential new trial on punitive damages, *see* Section 2.2, *infra*, the Court is obliged to deny the City's Rule 59(a) motion in its entirety.

## 2. RULE 59(e) MOTION TO ALTER OR AMEND THE JUDGMENT

The City's Rule 59(e) motion to alter or amend the judgment contains the two most significant claims for relief. The City begins by arguing that the Court should either entirely vacate the award of punitive damages or substantially reduce it. (Docket #225 at 7–16). The City then argues that the

Court must vacate the portion of the jury's verdict finding that Officers Gasser and Garland had falsely arrested Mr. Hardy. (Docket #225 at 17–18). Because the Court's decision on the false arrest issue may affect its determination on the punitive damages award, the Court will begin by addressing the jury's false arrest verdict.

### 2.1 False Arrest

The Court begins its false arrest analysis by setting forth the standards that apply in such cases. It then provides a bit of background regarding its denial of the City's request for summary judgment on the false arrest claim and the presentation of the claim to the jury. Then, with the benefit of that relevant background, the Court turns to analyzing the City's arguments in favor of vacating the award.

#### 2.1.1 False Arrest Standard

Probable cause is an absolute defense to a false arrest claim. *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713–14 (7th Cir. 2013). Probable cause exists where "the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Id.* at 714 (citing *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012); *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979); *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). While this requires "more than a hunch," it does not require that officers find "that it was more likely than not that the arrestee was engaged in criminal activity." *Abbott*, 705 F.3d at 714 (citing *Henry v. United States*, 361 U.S. 98, 102 (1959); *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010)). The inquiry is purely objective, requiring an examination of how a reasonable officer would act, knowing what the arresting officer knew at the time of the arrest. *Abbott*, 705 F.3d at 714 (citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004);

*Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *Whren v. United States*, 517 U.S. 806, 813 (1996); *Ornelas v. United States*, 517 U.S. 690, 696 (1996); *Tebbens v. Mushol*, 692 F.3d 807, 817 (7th Cir. 2012)).

### 2.1.2    Denial of Summary Judgment on False Arrest Claims

At summary judgment, the City requested that Mr. Hardy's false arrest claims be dismissed. In support, the City made two arguments. First, it argued that because Mr. Hardy had pled guilty to a resisting arrest charge, he had essentially admitted that Officers Gasser and Garland had probable cause to arrest him and was, in fact, precluded from arguing otherwise. (*See* Docket #83 at 2–3). Second, the City argued that the evidence established that the officers had probable cause to arrest Mr. Hardy. (*See* Docket #51 at 21–24). The Court found both arguments unpersuasive and declined to dismiss the false arrest claim.

The Court refused to give Mr. Hardy's plea agreement any preclusive effect absent further evidence. The Court noted that Wisconsin law applied, and that the Wisconsin Supreme Court had previously refused to give plea agreements preclusive effect. (Docket #93 at 17 (citing *Reynolds v. Jamison*, 488 F.3d 756, 762–63 (7th Cir. 2007)); *Mrozek v. Intra Fin. Corp.*, 2005 WI 73, ¶¶ 17–21, 281 Wis. 2d 448, 699 N.W.2d 54). And, even if a plea agreement could be used for preclusive effect, it would have been the City's burden to establish that it should be used for that purpose. (Docket #93 at 18 (citing *Masko v. City of Madison*, 2003 WI App 124, ¶ 4, 265 Wis. 2d 442, 665 N.W.2d

391)).[11] Because the City had failed to present any evidence to meet its burden, the Court refused to award preclusive effect to Mr. Hardy's plea.[12] (Docket #93 at 19).

The Court also rejected the City's probable cause argument. The City argued that, at the time the officers arrested Mr. Hardy, they had probable cause to believe that Mr. Hardy had violated Wis. Stat. § 946.41(1) for resisting or obstructing an officer, by virtue of the fact that Mr. Hardy had run away from them. (*See* Docket #51 at 21–24). The Court disagreed. In doing so, it engaged in a textual analysis of Wis. Stat. § 946.41(1), identifying the following four elements: "(1) resistance or obstruction of an officer, occurring while the officer (2) was acting in official capacity and (3) with lawful authority, and (4) further that the act was done knowingly." (Docket #93 at 21). Important among those elements was the requirement that the officers must have been acting "with lawful authority." (*See* Docket #93 at 22). The Court noted that the question of whether an "obviously-illegal strip search" had occurred was one for the jury. (Docket #93 at 22). And, if a strip search had, in fact, occurred, then any reasonable person in that situation would understand that they were acting without lawful authority and, thus,

---

[11]Given the record in this case, the Court does not find it analogous to *Timbuktu v. Koch*, 62 Fed. Appx. 676, 678–79 (7th Cir. 2003). In that case, the Seventh Circuit found that a plaintiff's claims for damages were precluded by a prior guilty plea to Wis. Stat. § 946.41(1). *Timbuktu*, 62 Fed. Appx. at 678–79. But in that case, the issue of probable cause "was actually decided—the state court made [its] determination after a hearing in which Timbuktu cross-examined three police officers, testified himself, and called another witness to testify on his behalf." *Id.*

[12]Nonetheless, the Court allowed the City the opportunity to renew this argument at a later time. (Docket #93 at 19). The City failed to do so before or during trial, and it has not renewed the argument now. The City having declined to renew this argument, the Court will not address it any further.

that Mr. Hardy was not acting unlawfully in fleeing. (Docket #93 at 22). The Court also acknowledged the Supreme Court's recognition that "[o]ne has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases." (Docket #93 at 22 (citing *United States v. Di Re*, 332 U.S. 581, 594 (1948))). For those reasons, the Court decided that the question of probable cause would have to be presented to the jury for determination of what happened prior to the arrest.

### 2.1.3. Presentation of Claim to Jury and Jury's Verdict

Against the foregoing backdrop, the Court presented Mr. Hardy's false arrest claim to the jury. In doing so, it instructed the jury using large portions of the Seventh Circuit's pattern jury instructions regarding false arrest and probable cause. *Compare* (Docket #203 at 20–21) *with* Seventh Circuit Pattern Jury Instructions—Civil, §§ 7.05, 7.06. However, in light of the complicated circumstances surrounding Mr. Hardy's claim, in an attempt to be as specific and as fair as possible, the Court provided additional instructions to address the precise circumstances of the case. (*See* Docket #203 at 21–22). The Court noted that, if the jury found that a strip search had occurred or that the officers lacked reasonable suspicion to stop Mr. Hardy, then it was allowed (though not compelled) to find that Mr. Hardy had been falsely arrested. (*See* Docket #203 at 21–22).

In the end, the jury returned a verdict in Mr. Hardy's favor on the false arrest claim. However, because the jury had determined that the officers did not strip search Mr. Hardy, its false arrest verdict necessarily rested on its finding that the officers lacked reasonable suspicion to stop Mr. Hardy.

### 2.1.4 Analysis

The City focuses upon that point—the fact that the jury's false arrest verdict rests upon its determination that the officers lacked reasonable

suspicion for a stop—to attack the jury's false arrest verdict. In making this argument, the City posits that "[i]f a person flees, even from an unlawful stop, the act of fleeing provides probable cause to arrest that person." (Docket #225 at 17 (citing *United States v. Sledge*, 460 F.3d 963, 966 (8th Cir. 2006))).

### 2.1.4.1    Waiver of Argument

The Court begins by pointing out that the jury's verdict was actually well-supported in light of the evidence and the jury instructions. With regard to probable cause, the Court instructed the jury using the Seventh Circuit's pattern instruction. (Docket #203 at 20–21). The Court also instructed the jury that if it "determine[d] that the officers' stop and/or search of Mr. Hardy was not based upon reasonable suspicion, then you may find that the officers were acting without lawful authority, and thus lacked probable cause to arrest Mr. Hardy." (Docket #203 at 21–22). The jury *did*, in fact, find that the officers lacked a reasonable suspicion to stop and search Mr. Hardy, and the Court has already determined that finding was reasonable. *See* Section 1.1.1, *supra*. Thus, the jury's verdict fully comported with the Court's instructions.

Because the City cannot argue that the jury did not properly follow the instructions, it would appear that the City is actually attempting to challenge the Court's jury instructions (*see* Docket #225 at 17–18); unfortunately for the City, this argument has been waived. Despite ample opportunity to object to the Court's false arrest instruction—whether at either of *two* final pretrial conferences or at the Court's extensive jury instructions conference[13]—the City declined to do so. (*See, e.g.*, Docket #152;

---

[13]The Court also points out that the City was in possession of the draft jury instructions for at least five weeks prior to trial.

#214; Docket #217 at 796:11–813:18). Thus, in the Court's view, the City has waived this argument. *See, e.g.*, *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 733 (7th Cir. 2004) (defendant waived argument by failing to propose jury instruction or object to court's instruction); *Jabat, Inc. v. Smith*, 201 F.3d 852, 857 (7th Cir. 2000) ("When parties do not object to jury instructions, these instructions generally become the law of the case. Once the law of the case is settled, the parties can only argue that the jury did not properly apply the instructions to the facts."); *Orix Credit Alliance v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 477–78 (7th Cir. 1997) (failure to raise objection to special verdict questions waives objection).

And waiver would be appropriate in this instance, in light of the performance of the City's attorneys. Throughout the case, the Court was met with obfuscation and lack of adequate preparation by the City's attorneys. (*See, e.g.*, Docket #214; Docket #215 at 240:15–20). And so it has happened yet again. Rather than raising an argument prior to the case being tried and sent to the jury, the City has opted to wait until after the verdict has been returned.

Nonetheless, the Court acknowledges that it may be required to rectify a legally-erroneous judgment, even when it did not receive objections as to jury instructions or a special verdict form. *See, e.g.*, *Duran v. Town of Cicero, Ill.*, 653 F.3d 632, 642–43 (7th Cir. 2011). Thus, the Court will address the substance of the City's argument.[14]

---

[14]Although the Court must point out that the City has decided not to put too much substance in its brief. As has occurred throughout this case, the City submitted a cursory argument first (Docket #225 at 17–18) followed by a more significant argument that attempts to backfill (Docket #242 at 12–16). And even then, the fuller argument *still* does not address the issue as thoroughly as it should.

### 2.1.4.2    Case Law Analysis

Thus, the Court turns to the legal issue: whether, as a matter of law, Officers Gasser and Garland must have had probable cause to arrest Mr. Hardy, thus rendering the jury's verdict (and the Court's resulting judgment) legally erroneous.

The Court begins with a common-sense point, rejecting the City's extremely broad assertion that "[i]f a person flees, even from an unlawful stop, the act of fleeing provides probable cause to arrest that person." (Docket #225 at 17). The concept of probable cause should not be so cut-and-dry as to create categorical rules such as that proposed by the City. The City's proposed rule would allow a police officer to arrest any person who flees, regardless of the officer's conduct prior to the arrest. This cannot be right, at least under Wisconsin law, which requires officers to act with lawful authority. Police officers should not be permitted to manufacture probable cause by engaging in conduct that they know is unlawful. For example, a person being beaten or strip-searched by an officer would create probable cause for that officer by running away. To be sure, these are not common circumstances. But, however rare, the Court wishes to avoid any rule that would jeopardize citizens' rights to escape the hands of an abusive police officer.

Of course, this is an extremely fine line to walk, because the safety of the community relies on subjects' cooperation with police directives. Any rules that restrict officers' discretion to make arrests of non-compliant individuals may result in dangerous situations, such as the escape of armed and/or dangerous individuals and shots being fired in the community.

But there is a significant gray area between arrests that are clearly unlawful and those that should clearly be lawful. That gray area is perfectly

exemplified in a case like this one. Here, the jury rejected Mr. Hardy's claims that the officers were engaged in the clearly-unlawful act of strip searching Mr. Hardy. On the other hand, the jury reasonably found that the officers lacked reasonable suspicion to stop Mr. Hardy.[15] *See* Section 1.1.1, *supra*.

Given that split verdict, which side of the line does the officers' arrest of Mr. Hardy fall? Was it an illegal false arrest due to the fact that the officers' initial stop and search of Mr. Hardy was illegal? Or was the illegal stop rendered null by Mr. Hardy's intervening decision to flee? The case law that the Court has been able to find on the topic provides inconclusive answers.

### 2.1.4.2.1  Seventh Circuit Authority

Nothing in the Seventh Circuit's body of case law compels any specific answer.

Perhaps the primary case to consider is *United States v. Green*, 111 F.3d 515, which the City has cited extensively (Docket #225 at 17). In *Green*, officers pulled over the defendant's car after recognizing it as having been parked outside of the house of a fugitive. *Id.* at 517–18. The officers testified that they believed the fugitive may have been in the car. *Id.* He was not, but the officers detained the car while performing a warrant-check on the defendant and his passenger. *Id.* The officers found that the passenger was the subject of an outstanding warrant and arrested him. *Id.* Thereafter, the defendant agreed to allow the officers to search his car, whereupon the officers found drugs and a gun. *Id.*

---

[15]The Court adds that it views the evidence to have shown that the defendant officers *knew* that they lacked reasonable suspicion, given their attempts to clean up the record by offering myriad post hoc rationalizations for their stop of Mr. Hardy.

The defendant was indicted and moved to suppress the evidence. The district court denied the motion, finding that the initial stop of the car: was valid under *Terry v. Ohio*, 392 U.S. 1 (1968); that the duration of the stop was reasonable; and that the officers were entitled to search the car as a result of arresting the passenger. *See Green*, 111 F.3d at 518.

The Seventh Circuit largely disagreed with the district court's reasoning. The Seventh Circuit held that the initial stop of the car was illegal, because the mere fact that it had been parked in front of the fugitive's house did not create reasonable suspicion. *Id.* at 520. The defendant conceded that the officers were justified in stopping the car to investigate whether the fugitive was present, but the Seventh Circuit found that this rationale could not support a continued detention once the officers had confirmed that the fugitive was not present. *Id.* This sort of initial illegality often triggers exclusion of all resulting evidence. *See id.* (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)).

Nonetheless, the Seventh Circuit declined to exclude the evidence. It found that there was sufficient attenuation between the initial illegal stop and the later search and discovery of evidence, such that the exclusionary rule should not apply. *See Green*, 111 F.3d at 521–523. In reaching that conclusion, the Seventh Circuit applied the three-factor test for attenuation announced in *Brown v. Illinois*, 422 U.S. 590 (1975). *See Green*, 111 F.3d at 521–23. The second factor of the *Brown* test—the presence of intervening circumstances—proved very important to the analysis. *See id.* Specifically, the Seventh Circuit found that the passenger's outstanding warrant constituted an intervening event that justified the officers' search. *Id.* at 521–22. In a passage quoted at length by the City (Docket #225 at 17–18), the Seventh Circuit cited three cases from other circuits "where the defendant's original

seizure was arguably unconstitutional, but after the initial illegal stop, circumstances developed giving the police probable cause to lawfully arrest the defendants." *Green*, 111 F.3d at 521–22 (internal citations omitted).

There are multiple reasons why the Court is unable to find that *Green* compels the Court to vacate the false arrest verdict in this case. To begin, *Green* deals with the attenuation and exclusionary rules applied in the context of a motion to suppress. By no means does it deal with the question of intervening circumstances in a false arrest case; it hardly even touches upon the concept of probable cause. Moreover, even accepting that the Court can import the legal concepts of *Green* into this case, the analysis is far more detailed than the City acknowledges. The *Green* court, together with the other circuits' cases it cited, all require a close examination of the intervening circumstances. *See, e.g.*, *id.*; *United States v. Nooks*, 446 F.2d 1283 (5th Cir. 1971); *United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995); *United States v. Bailey*, 691 F.2d 1009 (11th Cir. 1982). In a passage from *Green* that the City should have closely read—indeed, likely should have provided to the Court for full candor—the Seventh Circuit went on to discuss when intervening circumstances should dissipate some original illegality:

> Typically, the intervening circumstance which dissipates the taint involves a voluntary act by the defendant, such as the voluntary confession or consent to search given after an illegal search or seizure. In intervening circumstance cases involving subsequent action on the defendant's part, courts exercise great care in evaluating the later consent or confession to ensure it is truly voluntary and not the result of the earlier, and unconstitutional, police action....In these cases, the time between the illegality and the consent is important because the closer the time period, the more likely the consent was influenced by the illegality, or that the illegality was exploited. Conversely, where a lawful arrest due to an outstanding warrant is the intervening circumstance, consent (or any act for

that matter) by the defendant is not required. Any influence the unlawful stop would have on the defendant's conduct is irrelevant. And in the case of an arrest made pursuant to a warrant there is also no chance that the "police have exploited an illegal arrest by creating a situation in which [the] criminal response is predictable," such as creating a situation where the criminal will flee, which in turn will give the police an independent basis for an arrest, and thus a search incident to the arrest. Thus, in this case there is less "taint" than in the cases already recognized by the Supreme Court and this and other circuits as fitting within the intervening circumstances exception.

*Green*, 111 F.3d at 522 (internal citations omitted). Though those comments relate primarily to the issue of consent, they exhibit the Seventh Circuit's concern that illegal police action will prompt an illegal response. Those concerns are very relevant to this case, given the illegality of the initial stop and the extremely short period of time between the stop and Mr. Hardy's flight. In sum, *Green* is not directly applicable to this case and any applicability is significantly less important than the City suggests.[16]

The Court has been unable to locate any Seventh Circuit case law that provides any clearer answers. In *United States v. Johnson*, the Seventh Circuit rendered a decision very similar to *Green*. 383 F.3d 538 (7th Cir. 2004). But it is of limited applicability for the same reasons as *Green*: it was rendered in the context of an attenuation analysis and involved an outstanding warrant as an intervening event. *See id.* at 542–56. In *Henning v. O'Leary*, the Seventh

---

[16]The only cases applying *Green* to false arrest claims involve circumstances that were practically identical to *Green* (specifically, where the intervening circumstance was an outstanding warrant). *See, e.g., Carillo v. City of Chicago*, No. 09-CV-2803, 2013 WL 883975 at *1–*2 (N.D. Ill. Mar. 8, 2013); *Wofford v. Celani*, No. 11-CV-3543, 2013 WL 315744 at *4 (N.D. Ill. Jan. 28, 2013); *Burns v. Office of Atty. Gen'l*, No. 05-CV-858, 2009 WL 825778 at *12, n.14 (D. Minn. Mar. 27, 2009); *Hanks v. Cty. of Delaware*, 518 F. Supp. 2d 642, 648–49 (E.D. Pa. 2007).

Circuit noted that even if a "stop and search were illegal," the arrestee "had no right to resist the officers' attempts to arrest him." 477 F.3d 492, 495 (7th Cir. 2007) (citing *State v. Hobson*, 218 Wis. 2d 350, 577 N.W.2d 825, 837 (1998)). But that statement was made in dicta after it had already been determined that the plaintiffs' constitutional claims could not lie for other reasons. *See Henning*, 477 F.3d at 494–96. It also concerned the common law right of resistance; did not acknowledge Wis. Stat. § 946.41(1); and did not relate to a false arrest claim. *Id.*

### 2.1.4.2.2  Other Circuits' Authority

Since Seventh Circuit case law is unavailing, the Court looked at the law from other circuits. Again, none of the cases compel any specific result.

The Ninth Circuit has noted that "[t]he absence of probable cause does not grant an individual the right to offer resistance. An individual's limited right to offer reasonable resistance is only triggered by an officer's bad faith or provocative conduct." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001) (citing *United States v. Span*, 970 F.2d 573, 580 (9th Cir. 1992)). *See also Young v. Cty. of Los Angeles*, 655 F.3d 1156, 1164 (9th Cir. 2011). This seems to clearly leave open the possibility that Officers Gasser and Garland could have been liable for false arrest if they had acted in bad faith or employed provocative conduct. The City's response to this would likely be that the evidence did not show bad faith or provocative conduct. But that is why the City should have raised all of this in an objection to the jury instructions. Then, the Court could have addressed the parties' competing interests prior to trial. And if the Court adopted the Ninth Circuit's formulation, then Mr. Hardy would have had the opportunity to prove up bad faith or provocative conduct at trial.

The Fourth, Fifth, Eighth, Tenth, and Eleventh Circuits, in applying the exclusionary rule, have all engaged in analyses very similar to the Seventh Circuit's in *Green. See, e.g.*, *United States v. Sprinkle*, 106 F.3d 613, 619–20 (4th Cir. 1997); *Nooks*, 446 F.2d 1283; *Dawdy*, 46 F.3d 1427; *United States v. Boone*, 62 F.3d 323, 324 (10th Cir. 1995); *Bailey*, 691 F.2d 1009. But, for reasons similar to the Court's reluctance to apply *Green*, the Court hesitates to apply those other circuits' decision.

The City has cited to the *Sledge* decision from the Eighth Circuit, but the Court is unable to apply that decision for several reasons. 460 F.3d 963, *cert. denied*, 549 U.S. 1297 (2007). In *Sledge*, a police officer was watching a car that was parked outside of a liquor store. *Id.* at 964–65. He observed an exchange of money and alcohol between the driver of the car and an individual who had left the liquor store. *Id.* Believing that he observed the sale of alcohol to a minor taking place in the car, the officer approached the car. *Id.* Upon arriving at the car, the officer requested the driver's identification, which showed that the driver was 19 years old. *Id.* The officer also observed the defendant sitting in the back seat and recognized him as a suspect in other unrelated violations. *Id.* After backup had arrived, the officers took the defendant out of the car and began to pat him down. *Id.* The defendant then attempted to run away and was quickly apprehended. *Id.* The officers then performed a full search of the defendant, finding cash and cocaine. *Id.*

The defendant was indicted in federal court and moved to suppress that evidence. *Id.* The district judge denied that motion concluding that the defendant "forfeited any Fourth Amendment protection by resisting and running away from the officers, thus creating probable cause to arrest [the

defendant] for obstructing a peace officer, in violation of Neb. Rev. Stat. § 28-906(1)." *Id.* at 966.

The Eighth Circuit agreed with that conclusion, noting that "even assuming *arguendo* the detention and pat-down search of [the defendant] were invalid—a conclusion we need not reach today—[the defendant]'s actions provided independent grounds for his arrest." *Id.* at 967–68.

But the Court is not convinced that it should give authoritative weight to *Sledge*. Of course, it being an Eighth Circuit case, it is only entitled to persuasive authority in this district. *Sledge* also endorsed a very broad, bright-line rule—specifically, that the mere fact of an attempt to escape waives any Fourth Amendment privilege regardless of the legality of the officers' actions. *See id.* at 966–68. As the Court has already discussed, it is reluctant to endorse such a broad and inflexible rule. Moreover, the Eighth Circuit adopted this rule in a case where it was unnecessary. Given the fact that the officer in *Sledge* had observed what clearly appeared to be an illegal sale of alcohol to minors, he had reasonable suspicion to stop and search the defendant. *See id.* at 964–65. Not only does that make the Eighth Circuit's broad holding unnecessary (and, thus, potentially dicta), it also separates the circumstances in *Sledge* from those confronting Mr. Hardy. As already discussed extensively, Mr. Hardy did not take any action that would have given Officers Gasser and Garland reasonable suspicion to stop and search him. There is one more distinct difference between *Sledge* and this case: the *Sledge* court was considering whether probable cause existed to arrest the defendant for violations of Nebraska statutes, which differ in significant ways from Wisconsin's analog statutes. *Sledge* found that the defendant's flight created probable cause to arrest for a violation of "obstructing a police officer under Neb. Rev. Stat. § 28-906, or for resisting arrest under Neb. Rev.

Stat. § 28-904." *Id.* at 968. But both of those statutes make it a crime to resist an officer "acting under color of his or her official capacity." *See* Neb. Rev. Stat. §§ 28-904, 28-906. Wisconsin's statute, on the other hand makes it a crime to resist arrest only when the officer is acting "with lawful authority." Wis. Stat. § 946.41(1).

The Court ends this survey of case law with a recent decision from the D.C. Circuit that undercuts the City's position. In *United States v. Brodie*, the D.C. Circuit refused to find attenuation, contrary to the approach taken by the Fourth, Fifth, Eighth, Tenth, and Eleventh Circuits' decisions discussed above. 742 F.3d 1058, 1062–64 (D.C. Cir. 2014). *Brodie* is another exclusionary rule case. *Id.* It is important because its facts are very similar to the case at hand.

In *Brodie*, officers were waiting to execute a search warrant at the home of a murder suspect. *Id.* at 1060. While waiting, they saw the defendant (who was not the murder suspect) exit the home. *Id.* The officers then requested that the defendant stop and place his hands on a nearby car. *Id.* He initially complied, but shortly thereafter fled. *Id.* During his flight, he dropped three weapons. *Id.* Upon arresting the defendant, the arresting officer conducted a pat down search and recovered crack cocaine. *Id.* The defendant moved to suppress all of that evidence, which the district court denied. *Id.* at 1060–61.

The D.C. Circuit reversed the district court. *Id.* at 1064. It held that the officers' initial stop of the defendant was illegal, as it was not a valid *Terry* stop and also was not a legal seizure pursuant to an execution of a search warrant. *Id.* at 1061–62 (citing *Bailey v. United States*, --- U.S. ----, 133 S.Ct. 1031 (2013); *Michigan v. Summers*, 452 U.S. 692, 704–05 (1981); *Terry*, 392 U.S. 1).

Having determined that the initial stop was illegal, the D.C. Circuit next had to apply *Brown*'s attenuation test. *See Brodie*, 742 F.3d at 1063. In doing so, the D.C. Circuit held that the defendant's flight *did not* constitute an intervening circumstance. The Court quotes from *Brodie* at length, because the situations are very similar:

> The government contends that Brodie's flight and abandonment of evidence were intervening circumstances that purged the taint. As those events flowed directly from the seizure, however, it is hard to spot any attenuation. *See United States v. Wilson*, 953 F.2d 116, 127 (4th Cir. 1991). There are indeed a number of cases where courts have found attenuation in a defendant's response to illegal police conduct. But in those decisions the court found that the defendant had committed a new crime, *e.g.,* [ ] *Bailey*, 691 F.2d [at] 1015–18[ ], or had at least fled in a manner posing serious risks to the public safety—typically a vehicular flight leading to a high-speed car chase, *e.g.,* [ ] *Boone*, 62 F.3d [at] 324[ ].
>
> *Bailey* contains perhaps the most analysis. The defendant engaged in forcible resistance to the seizing officers, which the court regarded as a violation of 18 U.S.C. § 111, making it a crime to forcibly resist officers of the United States going about the execution of their duties. The conclusion depended on the court's reading § 111 as withholding any defense based on the illegality of the officers' prior conduct. *Bailey*, 691 F.2d at 1018. Plainly we need not get into the soundness of these cases: Brodie fled on foot, and the manner of his flight in itself posed no incremental threat to anyone.
>
> As to Brodie's discard of his weapons, the *Bailey* court's treatment of a similar case is persuasive. The court noted that a defendant's tossing marijuana out a car window during an illegal stop did not constitute a new, attenuating crime: the tossing "only revealed [the] extant crime and did not itself constitute a crime." *Id.* at 1017. So here.

*United States v. Brodie*, 742 F.3d 1058, 1063-64 (D.C. Cir. 2014).

*Brodie*'s rationale applies almost perfectly to the situation at hand: the officers' initial stop of Mr. Hardy was illegal; that illegal stop precipitated Mr. Hardy's flight in quick succession; Mr. Hardy's flight did not pose any incremental threat to anyone.

### 2.1.4.2.3  Wisconsin Authority

Lacking any clear rule from the Seventh Circuit or any other circuit, the Court finds it prudent to also look to Wisconsin law. It is, of course, a nuance of Wisconsin law—the requirement that officers be acting with lawful authority—that ultimately creates the question of whether Officers Gasser and Garland had probable cause to arrest Mr. Hardy.

Again, the Court receives mixed guidance. In *State v. Ferguson*, the Wisconsin Supreme Court affirmed that the lawful authority requirement is a substantive element of Wis. Stat. § 946.41(1), and that "a constitutional violation is an unlawful act." 2009 WI 50, ¶¶ 14–17, 23, 317 Wis. 2d 586, 767 N.W.2d 187. On the other hand, the Wisconsin Supreme Court has abrogated the common law privilege to resist an unlawful arrest; but that deals only with the *common law right* to do so—not with the fact that Wis. Stat. § 946.41(1) requires, as an element, that officers act with lawful authority. *Wisconsin v. Hobson*, 218 Wis. 2d 350, 379-80, 577 N.W.2d 825, 837 (1998). The Wisconsin Court of Appeals recognized that distinction. *Wisconsin v. Annina*, 2006 WI App 202, ¶ 18, 296 Wis. 2d 599, 609-10, 723 N.W.2d 708, 713. Considering all of this authority, the Western District of Wisconsin noted that "[w]ithout lawful authority to make the demand [to step outside of a bar] in the first place, [an officer] would have no probable cause to believe plaintiff was violating § 946.41(1) by ignoring his directive." *Brunner v. McKillip*, 488 F. Supp. 2d 775, 784-85 (W.D. Wis. 2007). Likewise, here, without lawful authority to stop Mr. Hardy in the first place, the officers should have had no

probable cause to believe that Mr. Hardy was violating § 946.41(1) by refusing to comply with their directives.

### 2.1.4.3 False Arrest Conclusion

The Court reiterates that the City likely waived this argument. *See* Section 2.1.4.1, *supra.*

But, even if it not, neither the jury instructions nor the verdict in this case were legally erroneous, and thus the Court will allow the jury's verdict to stand. *See Duran*, 653 F.3d at 642–43. There is no clear answer to this question, but the Court finds that the authority weighs slightly in favor of its original position. The text of the statute, requiring lawful authority on the part of the officers, is of particular importance. *See* Wis. Stat. § 946.41(1). Wisconsin courts have affirmed that lawful authority is an element of the crime, *e.g., Ferguson*, 2009 WI 50 at ¶¶ 14–17, 23, and the Western District of Wisconsin has interpreted the statute similarly to this Court, *see Brunner*, 488 F. Supp. 2d at 784–85. Most of the exclusionary rule cases that could support the City's position are distinguishable. In fact, of all the exclusionary rule cases, *Brodie* is by far the most similar and resulted in exclusion of the evidence. While the issue presents a close call, the Court ultimately finds that the authority supports the Court's instructions and the jury's verdict. There was no legal error.

In asking whether an arrest was legal, the Supreme Court has instructed courts to determine whether a police officer's mistake was "understandable" or that "the arrest [was] a reasonable response to the situation facing [the officer] at the time." *See Atkins v. City of Chicago*, 631 F.3d 823 (7th Cir. 2011) (citing *Hill v. California*, 401 U.S. 797, 804 (1971)). In this case, the evidence showed that the officers' actions were neither understandable nor reasonable. The officers, themselves, manufactured the

situation by stopping Mr. Hardy illegally. When Mr. Hardy took action against that stop—similar to the defendant in *Brodie*—he did not present any additional threat to the community, and the officers should have taken no further action, knowing that they had no basis to stop him in the first place.

To be sure, the Supreme Court has recognized the necessity of flexibility for police officers to do their jobs. *See, e.g.*, *Illinois v. Gates*, 462 U.S. 213, 232 (1983). It has even recently allowed an officer's reasonable mistake of law to support reasonable suspicion. *See Heien v. North Carolina*, --- U.S.----, 135 S. Ct. 530 (2014). But whatever leeway has been allowed, all courts should be reluctant to endorse the ability of police officers to engage in illegal stops.[17]

In the end, the Court properly instructed the jury, creating a hybrid instruction that took into account Wis. Stat. § 946.41(1) and the Seventh Circuit's pattern instructions, and the jury properly applied the Court's instructions. The Court instructed the jury to look for probable cause and noted that the jury *may* find a false arrest if the officers lacked a reasonable suspicion to stop Mr. Hardy. (*See* Docket #203 at 21–22). The jury considered all of the evidence and concluded that the evidence established false arrest.

---

[17]The City makes a half-hearted attempt to assert qualified immunity. (*See* Docket #225 at 18; #241 at 15). Again, this is an argument that should have been raised before the jury was instructed, so the Court finds that it has been waived. *See, e.g.*, *Republic Tobacco Co.*, 381 F.3d at 733. Even if not waived, the Court finds that case law had clearly established lawful authority as an element of Wis. Stat. § 946.41(1). *See, e.g.*, *Ferguson*, 2009 WI 50 at ¶¶ 14–17, 23. Mr. Hardy also had a clearly-established constitutional right not to be arrested without probable cause. In light of this, the Court is of the opinion that the officers "should have been on notice that [Mr. Hardy] had a right to be free from arrest. *Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014) (citing *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 762 (7th Cir. 2006)).

That finding, being consistent with the evidence and an application of proper law, must stand.

### 2.2    Punitive Damages

The City's request that the Court reduce or set aside the punitive damages award is the most significant part of the Rule 59 motions now under consideration.

#### 2.2.1    Vacatur of Entire Punitive Damages Award

The Court has already considered and rejected the City's request to entirely set aside the punitive damages award. *See* Section 1.1.3, *supra*. In sum, the Court found ample evidence to support a punitive damages award.

#### 2.2.2    Application of 1:1 Ratio

The Court can also readily reject the City's second punitive damages argument. The City's second argument is that the Court should reduce the punitive damages award using a 1:1 ratio,[18] creating federal common law that imposes such a limit on all civil rights cases. This argument fails for multiple reasons. First, the primary case cited by the City, *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008), is a maritime case. (*See* Docket #225 at 11–13). Second, the Court cannot find any cases from the Seventh Circuit or any other circuit that adopt such a limit. In fact, the Court cannot find any case law that even questions whether punitive damages in civil rights cases are available at ratios higher than 1:1. Finally, the Seventh Circuit considered whether to extend *Exxon Shipping*'s 1:1 ratio to civil rights cases and implied it would not, though it did not ultimately need to reach the question. *Kunz v. DeFelice*,

---

[18]All ratios are in punitive:compensatory damage format. So a 1:1 ratio would obviously be $1.00 of punitive damages to $1.00 of compensatory damages; a 10:1 ratio would be $10.00 of punitive damages to $1.00 of compensatory damages.

538 F.3d 667, 678–79 (7th Cir. 2008). For these reasons, the Court cannot adopt the City's proposed 1:1 ratio.

### 2.2.3 Reduction of Award Pursuant to Principles of Due Process

So, all that is left is the City's request to reduce the award because it violates due process. In appropriate circumstances, the Court has the authority to grant a new trial on damages or a remittitur of an award that is excessively large. *See, e.g.*, *AutoZone*, 707 F.3d 824, 838–39 (7th Cir. 2013); *American Nat'l Bank & Trust Co. of Chicago v. Regional Transp. Authority*, 125 F.3d 420, 437 (7th Cir. 1997); *DeBlasio v. Ill. Cent. R.R.*, 52 F.3d 678, 687 (7th Cir. 1995). But, consistent with the Seventh Amendment's limitations on a judge's power to reexamine a jury verdict, the Court must be sure to accord proper deference to the jury's verdict. *Farfaras v. Cit. Bank & Trust of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006); *American Nat'l Bank & Trust Co.*, 125 F.3d at 437.; *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995); *Cygnar v. City of Chicago*, 865 F.2d 827, 847 (7th Cir. 1989). The Court must limit its consideration to "'whether a punitive damage award is grossly excessive such that it offends due process: (1) the degree of reprehensibility of defendant's conduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and his punitive damages award; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases.'" *Farfaras*, 433 F.3d at 567 (quoting *Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir.2004); citing *BMW of N.A., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). *See also AutoZone*, 707 F.3d at 838 (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)).

The Court will apply each of those three guideposts to determine whether it should reduce the award and, if so, by how much.

### 2.2.3.1 Reprehensibility of Defendants' Conduct

"The first guidepost requires [the Court] to consider the reprehensibility of the defendant's conduct and is '[p]erhaps the most important indicium of the reasonableness of a punitive damages award.'" *AutoZone*, 707 F.3d at 838 (quoting *Gore*, 517 U.S. at 575). The Supreme Court has further elaborated on this guidepost by providing courts with five factors for analyzing the reprehensibility of a defendant's conduct:

(1)    whether "the harm caused was physical as opposed to economic";

(2)    whether "the tortious conduct evinced an indifference to or a reckless disregard for the health or safety of others";

(3)    whether "the target of the conduct had financial vulnerability";

(4)    whether "the conduct involved repeated actions or was an isolated incident"; and

(5)    whether "the harm resulted from intentional malice, trickery, or deceit, or mere accident."

*State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576–77).

The first of those factors weighs in favor of Mr. Hardy. The illegal stop and false arrest did not involve an actual use of violence or cause physical injury to Mr. Hardy. But both actions caused him mental harm and the latter resulted in his physical detention for a significant period of time. In considering an award of punitive damages on a malicious prosecution claim, the Second Circuit recognized that a prosecutor "exercised an authority backed by the weight and force of state power." *Lee v. Edwards*, 101 F.3d 805, 810 (2d Cir. 1996). Thus, while the prosecutor's "decision to charge [the plaintiff] falsely was implemented merely by an entry on a form,…that act nevertheless had the power to set into motion the coercive apparatus of the state, which is ultimately rooted in a willingness to use force." *Id.* (citing

*Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 392 (1971)). The Second Circuit found such willingness to be evidence of violence, weighing in favor of reprehensibility under its pre-*State Farm* reprehensibility framework. *See Lee*, 101 F.3d at 809–810. If anything, Mr. Hardy's situation is more aggravated than the plaintiff's in *Lee*, so the Court finds that the harm to Mr. Hardy was physical; it is certainly more than economic.

The second factor also weighs in Mr. Hardy's favor. In illegally stopping Mr. Hardy to begin with, the officers' conduct evinces an indifference to the health and safety of others. As is evident from recent events surrounding the deaths of Dontre Hamilton in Milwaukee, Eric Garner in New York, and Michael Brown in Missouri, even the most routine police stop has the possibility of escalating quickly. In other words, police stops of citizens should not be taken lightly. And yet, for no apparent reason, the officers in this case decided to stop Mr. Hardy. And, without a doubt, the situation ended up escalating. Fortunately, no one was injured in this case. But there is a thin line between Mr. Hardy's leaving the scene in a police car as opposed to an ambulance. Mr. Hardy is not blameless in this situation—assuming that he was not strip-searched, as the jury found—he put himself and others at risk by fleeing from an illegal but fairly standard search. But the Court must be mindful of the fact that he would never have been placed in that situation were it not for the precipitating event: the officers' decision to illegally stop him.

The third factor weighs slightly in Mr. Hardy's favor. As far as the Court can discern, Mr. Hardy is of limited means. However, this factor does not weigh heavily in either direction, because there is no evidence that Mr. Hardy suffered any negative financial consequences as a result of the officers' actions.

The fourth factor does not weigh heavily in either direction. There was no evidence produced at trial to show that the defendant officers had engaged in repeated acts of this sort.[19]

The fifth factor also does not weigh heavily in either direction. The Court held that the jury reasonably found that the officers had acted with reckless or callous indifference to Mr. Hardy's rights. That seems to fall somewhere in between "intentional malice, trickery, or deceit," and an "accident."

In the end, having applied these five factors, the Court is left to determine that the officers' actions were reprehensible. Three factors weigh in favor of reprehensibility, whereas two factors do not weigh in either direction. Perhaps the officers' actions in this case were not the worst actions conceivable, but they did clearly violate Mr. Hardy's rights. On balance, the scales tip in Mr. Hardy's favor on this first guidepost.

### 2.2.3.2 Disparity Between Harm and Punitive Damages Award

The second guidepost weighs in favor of the City. "The Supreme Court has repeatedly declined to set a fixed ratio to limit punitive damages based on constitutional grounds, but it has recognized that in practice, 'few awards exceeding a single-digit ratio between punitive and compensatory

---

[19]However, with that said, it is apparent that MPD has opted to continue the sort of illegal stops that Mr. Hardy was subject to. MPD Chief Edward Flynn has made clear that one of his prerogatives is encouraging large amounts of pedestrian stops, regardless of the reasons. In criticizing *Floyd v. City of New York*, the Southern District of New York case finding the New York Police Department's stop-and-frisk tactics illegal, Chief Flynn stated, "That's what worries us about what's happening in New York. It would be a shame if some people decided to put us back in our cars just answering calls and ceding the streets to thugs." Heather MacDonald, "How To Increase the Crime Rate Nationwide," *The Wall Street Journal* (June 11, 2013) (quoting previous Flynn statements to *L.A. Times*).

damages…will satisfy due process.'" *AutoZone*, 707 F.3d at 839 (quoting *State Farm*, 538 U.S. at 424–25). "This approximation is not definitive because 'courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.'" *AutoZone*, 707 F.3d at 839 (quoting *State Farm*, 538 U.S. at 426). The Seventh Circuit, in a pre-*State Farm* decision, however, offered the following proviso, which is important to remember:

> The smaller the compensatory damages, the higher the ratio of punitive to compensatory damages has to be in order to fulfill the objectives of awarding punitive damages, which we canvassed in *Kemezy v. Peters*, 79 F.3d 33, 34–35 (7th Cir. 1996)…The compensatory damages were low here in part because of the inherent difficulties of fixing a dollar equivalent for subjective injuries, such as fright and pain. An award of punitive damages proportioned to the low compensatory damages that were awarded would have a very meager deterrent effect, would fail to signal to the prison authorities that savage treatment of prisoners will not be tolerated, and would not be commensurate with the moral gravity of the defendants' actions.

*Cooper v. Casey*, 97 F.3d 914, 919-20 (7th Cir. 1996) (affirming punitive damages award of $22,500.00 with a 12:1 ratio) (internal citation to *Gore*, 517 U.S. at 587 (Breyer, J., concurring), omitted). The Seventh Circuit affirmed this general principle in *Alexander v. City of Milwaukee*, 474 F.3d 437, 454 (7th Cir. 2007) (affirming punitive damages award with ratio up to 10.73:1, noting that the compensatory damages were relatively low).

In this case, the jury awarded a total of $500,000.00 in punitive damages and $6,000.00 in compensatory damages. This leads to an extremely high ratio of more than 80:1.

The City is correct that such a high ratio cannot stand. This is not the exceptional case in which the punitive damages award should exceed a

single-digit ratio. *See State Farm*, 538 U.S. at 424–25. To be sure, the defendant officers' actions were reprehensible examples of police misconduct and the Seventh Circuit takes police misconduct very seriously. *See Cooper*, 97 F.3d at 919 (in police brutality case, noting that "[t]he need to deter such behavior is plain: police brutality is a longstanding problem with which many cities are still coming to grips"; while perhaps not as serious as police brutality, illegal stops like the ones in this case are still very prevalent and should be viewed with great skepticism). But, on the greater scale of police misconduct, the illegal stop and false arrest in this case fall toward the less-serious end.

However, with that said, the Court notes that the compensatory damages award in this case was relatively low, and so the ratio of punitive to compensatory damages can logically be on the higher end of the single-digit scale. *See Cooper*, 97 F.3d at 919–20.

Applying these principles, the Court finds that a 9:1 ratio should work quite well. That ratio is still within the single digits, but at the higher end of the range. It would result in a total award of $60,000.00, comprised of $6,000.00 in compensatory damages and $54,000.00 in punitive damages.

### 2.2.3.3   Comparison With Other Cases

Both parties agree that it is difficult to adequately compare the award in this case to awards in other cases. (*See* Docket #225 at 15; #239 at 18–20). The fact-specific nature of claims, particularly in the civil rights context, results in a dearth of apples-to-apples comparisons. Addressing every existing case (or even all of the cases cited by the parties) would be a fool's errand. Suffice it to say that Mr. Hardy is correct when he notes that "[o]f course, there are verdicts with lower punitive damages awards just as there are comparable cases with higher awards…." (Docket #239 at 19–20).

With a specific reduction already in mind—$54,000.00 using a 9:1 ratio—the Court will compare that decision to other, related awards to ensure that it is in line. The Court finds the following Seventh Circuit cases instructive:

- *Hendrickson v. Cooper.* In case involving aggravated use of excessive force, Seventh Circuit affirmed total award of $200,000.00, comprised of $125,000.00 of punitive damages and $75,000.00 of compensatory damages. 589 F.3d 887, 894–95 (7th Cir. 2009).

- *Kunz v. DeFelice.* In police brutality case, Seventh Circuit affirmed total award of $100,000.00, composed of $90,000.00 of punitive damages and $10,000.00 of compensatory damages. 538 F.3d at 679.

- *Alexander v. City of Milwaukee.* In multi-plaintiff employment discrimination case, Seventh Circuit affirmed award of $102,000.00 in punitive damages to each plaintiff. Resulting ratio ranged from 2:1 to 10.73:1, as plaintiffs had received compensatory damages awards ranging from $9,500.00 to $50,000.00. 474 F.3d at 454.

The Court believes that its proposed reduction falls squarely in line with those cases. To begin, the officers' actions in this case were not as aggravated as what occurred in *Hendrickson* or *Kunz.* Therefore, it is rational that the punitive damages award should be less than what was awarded in either of those cases. Meanwhile, both *Kunz* and *Alexander* support the fact that a 9:1 ratio is available and constitutional. Moreover, *Alexander* employed a ratio of greater than 9:1 on facts that, while much different, do not show significantly greater reprehensibility than what occurred in this case. Finally, the Court notes that the City may attempt to argue that the Court should reduce the ratio further, pursuant to *Hendrickson*, seeing as *Hendrickson* involved more aggravated facts and utilized a ratio of less than 2:1. The Court would reject such reasoning, noting that the compensatory damages

award in *Hendrickson* was very large, meaning that a lower ratio was necessary to keep the punitive damages in the realm of constitutionality.

### 2.2.4   Damages Conclusion

In sum, the Court has considered and rejected the City's request to vacate the entire punitive damages award or reduce it to a 1:1 ratio.

Nonetheless, the Court is obliged to reduce the punitive damages award, so that the award comports with principles of due process. Having applied the three guideposts for assessing the constitutionality of punitive damages, the Court has determined that it must reduce the punitive damages award to $54,000.00, or $27,000.00 against each officer. This reduction results in a total award of $60,000.00 to Mr. Hardy, comprised of $6,000.00 in compensatory damages and $54,000.00 in punitive damages.

Having determined that remittitur is necessary on the basis that the jury "simply…overcompensated" Mr. Hardy, the Court is obliged to offer Mr. Hardy the choice between accepting the Court's reformulated punitive damages award and a new trial. *See, e.g.*, *Fox v. Hayes*, 600 F.3d 819, 846 (7th Cir. 2010) (citing *Ramsey v. Am. Air Filter Co.*, 772 F.2d 1303, 1314 (7th Cir. 1985); Wright, Miller & Kane, *216–17 Federal Practice & Procedure* § 2820 (2d ed. 1995 & Supp. 2009); *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1244 (7th Cir. 1982)). The Court will offer Mr. Hardy 21 days within which to file a letter with the Court, either consenting to or refusing the Court's remission of the punitive damages award. If Mr. Hardy refuses to consent to the reduced award, the Court will be obliged to conduct a new trial on the question of punitive damages, alone.

4.      CONCLUSION

In sum, the Court will grant in part and deny in part the City's Rule 59 motions. In all but one respect, the Court is obliged to deny those motions. But the one respect in which the Court must grant the motion is significant: it must reduce the total punitive damages award from $500,000.00 to $54,000.00. Without a doubt, this is a very substantial reduction. But, in light of the evidence and case law, $54,000.00 in punitive damages is actually a very large amount. In total, the City is obliged to pay $60,000.00 to Mr. Hardy.

And that $60,000.00 does not take into account the fact that Mr. Hardy, as the prevailing party, is also entitled to a very significant award of attorneys' fees and costs. *See* 42 U.S.C. § 1988; Fed. R. Civ. P. 54(d)(1). At this juncture, the Court will not address the specifics of Mr. Hardy's motion for fees (Docket #219) and his request for costs (Docket #220). Rather, the Court will again refer this case to Magistrate Judge Aaron Goodstein for one or more mediation sessions, with the thought that the parties may be able to reach a settlement on those matters. As the Court has done throughout the pendency of this case, it urges the parties to work cooperatively with one another in addressing these remaining issues. Significant time and money could have been saved if the City had considered reasonable efforts designed to achieve resolution of the case short of trial.  Instead, the City adopted an antagonistic approach that resulted in a trial only to be followed by the pending request for significant fees and costs. So, once again the time is ripe to consider taking a reasoned, collaborative approach to conclude the remaining issues. But, for the moment, there matters remain in the hands of the parties, working with Magistrate Judge Goodstein. If the parties are

ultimately unable to reach a settlement on costs and fees, the Court will take such further action as may become necessary.

Finally, the Court must do a bit of housekeeping. First, the Court acknowledges receipt of Mr. Hardy's motion to adjourn the adjudication of his bill of costs until after resolution of the Rule 59 motions. (Docket #232). The Court will deny that motion as moot, because it has now addressed the Rule 59 motions without addressing Mr. Hardy's bill of costs. Second, the Court will grant Mr. Hardy's motion to amend or correct his bill of costs. (Docket #237). Mr. Hardy's attorneys accidentally failed to attach an exhibit when docketing the bill of costs, and the Court sees no reason why they should not have an opportunity to correct that inadvertent mistake, especially in light of the fact that this matter has now been prolonged by the City's Rule 59 motions. The City's opposition is yet another example of the sort of unnecessary intransigence exhibited by the City throughout the pendency of this case.

Accordingly,

IT IS ORDERED that the City's Rule 59(e) motion to alter or amend the judgment (Docket #224) and Rule 59(a) motion for a new trial (Docket #226) be and the same are hereby GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that the Rule 59 motions are granted insofar as the Court is obliged to reduce the punitive damages award to $54,000.00 (comprised of $27,000.00 apiece against Officer Gasser and Officer Garland) or to grant a new trial on the issue of punitive damages. Within 21 days of the entry of this order, Mr. Hardy shall file a letter with the Court either consenting to the reduced punitive damages award or requesting a new trial. In the event that Mr. Hardy elects to accept the reduced punitive damages award, the Court will immediately enter an amended judgment

reflecting the reduced award. In the event that Mr. Hardy elects a new trial, the Court will coordinate with the parties to schedule the trial to occur forthwith.

IT IS FURTHER ORDERED that the Rule 59 motions are denied in all other respects.

IT IS FURTHER ORDERED that Mr. Hardy's motion for fees (Docket #219) and bill of costs (Docket #220) be and the same are hereby REFERRED to Magistrate Judge Aaron Goodstein for one or more mediation sessions. The parties shall coordinate with Magistrate Judge Goodstein's chambers to set up the mediation session or sessions.

IT IS FURTHER ORDERED that Mr. Hardy's motion to adjourn adjudication of his bill of costs (Docket #232) be and the same is hereby DENIED as moot.

IT IS FURTHER ORDERED that Mr. Hardy's motion to amend or correct his bill of costs (Docket #237) be and the same is hereby GRANTED.

Dated at Milwaukee, Wisconsin, this 27th day of February, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge